# Richmond

## NOREMAC, INC. v. CENTRE HILL COURT, INC.

March 14, 1935.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and
Browning, JJ.

154

The opinion states the case.

*Willis W. Bohannan,* for the appellant.

*White & Temple,* for the appellee.

BROWNING, J., delivered the opinion of the court.

This is a lien creditor's suit. Its purpose is the subjection of certain lots belonging to the appellant to the payment of liens alleged to be binding upon the lots by reason of assessments against them under the terms of the deed and agreement to which a former owner of the lots in controversy and other lots; and therefore a predecessor in title to the appellant, and the appellee, were parties.

The lots are a portion of a block containing originally thirty lots but which was subsequently reduced to twenty-nine, which constituted a subdivision of the city of Peters-

burg, known as Centre Hill subdivision. With the deed creating this subdivision was recorded a plat showing the lots by number and the parks, driveways, walkways, streets, and alleys, projected thereon; there was also a plat recorded with the deed with which we are here concerned, showing the above situation, with respect to the reduced number of lots. The deed and agreement first referred to, dated October 15, 1912, through which the title to the twenty-nine lots passed contained these provisions:

"As a further consideration for the conveyance to it by the said Centre Hill Court, Incorporated, of the property above described as being conveyed to it, and as a further consideration for the acceptance by the said Centre Hill Court, Incorporated, of the obligation to maintain, hold, pay taxes on, and keep in repair the said walkways, driveways, alleys and park areas, shown on the said plat, the said Centre Hill Building Corporation, as the owner of lots numbered two (2) to twenty-nine (29), inclusive, and the said American Bank and Trust Company, Incorporated, as the owner of lot number one (1), on the said plat, hereby agree and covenant that each and all of the said lots shall be subject to such annual charges as may be necessary for paying the taxes on the property vested in Centre Hill Court, Incorporated, and for keeping up the driveways, walkways, streets, alleys and park areas, shown on the said plat.

"Each lot shall be subject to such annual charges as may be necessary for paying the taxes on the property of Centre Hill Court, Incorporated, and for keeping up the driveways, walkways, streets, and parks, as shown, but the annual charge on each lot shall not exceed in any case $50, per year, and shall be fixed by said Centre Hill Court, Incorporated."

There were intermediate deeds and trust deeds forming a part of the chain of title to the lots which contained apt and appropriate references to the covenant in the deed and agreement of October 15, 1912, which were intended to be in accordance with the provision in that deed: "And that the conveyances of each and every of said lots numbered one

(1) to twenty-nine (29), inclusive, will contain a covenant running with the land that the owner of said lot will promptly pay said annual charge to said Centre Hill Court, Incorporated, as the same becomes due and payable; which annual charge shall be considered as a part of the purchase price of each of the said lots and shall be fixed annually by said Centre Hill Court, Incorporated, but which annual charge on each of said lots shall not exceed fifty dollars ($50), per year, without the consent of each and all of the owners of said lots."

The Centre Hill Court, Incorporated, is a corporation created and existing under the laws of the State of Virginia, with its principal office in the city of Petersburg, without capital stock, and not for the purpose of profit. Its purposes, as set forth in its certificate of incorporation, are as follows: "To perpetually hold, maintain, improve and beautify, without profit to itself, such parks, streets, walkways, driveways and alleys, as shall be established or laid out by Centre Hill Corporation, a corporation under the laws of the State of Virginia, or by any other person upon the Centre Hill property, for the perpetual use in common for all purposes for which a public street or park may be used, of each and all of the owners of any lot or portion of the said Centre Hill property as the same shall be divided into lots as appurtenant to said lots."

The management and control of the corporation, the appellee, is vested in the lot owners who are members of the corporation by virtue of such ownership.

The by-laws provided that a quorum at any meeting shall consist of the members representing a majority of the lots, numbered from one to thirty, inclusive, on the plat, such representation being either in person or by proxy.

Later the number of lots was reduced to twenty-nine and we think that the spirit of the provision and its intendment is effected by regarding a majority of the members representing the actual number of lots within the terms of the deed of October 15, 1912, as a quorum. Therefore a

meeting of members representing fifteen lots would be legally constituted so far as a quorum is concerned.

The appellant by deed of January 8, 1932, became the owner of lots numbered two, three, four and five of the said subdivision. Its predecessor in title, which owned the lots during the years 1925 to 1928, inclusive, was the Bollingbrook Construction Corporation, which was assessed in the sum of twenty-five dollars ($25) per year for each of the lots, making the total assessment for the four years, four hundred dollars ($400), which was subject to a credit of fifty dollars ($50) paid by the Bollingbrook Corporation. This left a balance due and unpaid of three hundred and fifty dollars ($350). This the appellant declined to pay and the suit to compel payment followed.

The contention of the appellee is that the covenant in the deed and agreement of October 15, 1912, constituted an equitable lien or charge against the lots with which all subsequent holders were affected with notice. It will be noted that by the terms of the covenant the amount of the annual charge on each lot was to be fixed by the Centre Hill Court, Incorporated, but was limited in any case to the sum of fifty dollars per year on each lot as the maximum.

The validity of the assessments involved is challenged by the appellant on the grounds that the corporate action creating them does not comply with the requirements of the law obtaining in such matters.

The appellant also denies that the covenant effects an equitable lien with notice to it.

The lower court held against the contentions of the appellant and decreed the existence of an equitable lien in the case in favor of the appellee, and the validity of the assessments against the lots, except as to the assessments for the year 1925, which it said was invalid because the meeting of the corporation, at which it was made, was not properly held.

The first consideration with which we are concerned is whether the covenant, which we have referred to, operated to effect an equitable lien upon the lots in question.

In Jones on Liens (3d Ed.) vol. 1, page 24, section 27, it is said, in part: "An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation, or is declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. Equitable liens by contract of the parties are as various as are the contracts which parties may make."

This author, in section 28 of the same volume, quotes from Pomeroy's Equity Jurisprudence, section 1234, where it is said: "It follows, therefore, that in a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, in addition to the personal obligation, a peculiar right over the thing concerning which the contract deals, which it calls a 'lien,' and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing. The theory of equitable liens has its ultimate foundation, therefore, in contracts, express or implied, which either deal with, or in some manner relate to, specific property, such as a tract of land, etc."

Mr. Jones, in elaborating the subject, says in substance, that it must appear by the agreement that the parties intended to create a charge upon the property; that the property intended to be charged must be designated and that it must be capable of identification, with a reasonable degree of certainty. The covenant involved in the present case meets these requisites. Their existence cannot be doubted.

In Jones on Liens, vol. 1, section 35, is found the following: "An equitable lien is created by an agreement between several persons that the cost of certain improvements shall be a lien on their respective estates, though these are not immediately connected with the improvements."

The author supports the text by citing the case of *Clarke*

v. *Southwick,* Fed. Cas. No. 2863, 1 Curt. (U. S.) 297, in which it was said: "Whenever the owner of real property agrees, in writing, for a valuable consideration, that a lien for a debt or duty shall exist on that property, in the view of a court of equity, it does exist."

In *Collyer* v. *Fallon,* 1 Turn. & Russ. 469, the principle is laid down: "Contract, with respect to a given matter, binds the property, as between the parties to the contract, and all claiming under them, with notice."

In *Legard* v. *Hodges,* 1 Ves. Jr. 477, Lord Loughborough said: "I take the maxim to be universal, that wherever persons agree concerning any particular subject, in a court of equity, as against the party himself, or any claiming under him voluntarily, or with notice, a trust is raised."

The recent case of *Prudential Ins. Co. of America* v. *Wetzel et al.,* 212 Wis. 100, 248 N. W. 791, 792, is very like the case under consideration. It involved the foreclosure of a mortgage, dated and recorded December 14, 1927, executed by Wetzel and wife for the benefit of the plaintiff, the Prudential Insurance Company. The First Wisconsin National Bank of Milwaukee interposed a cross-claim asserting a second mortgage, recorded February 14, 1930. Washington Homes Association interposed a cross-complaint asserting a claim for a lien under a declaration made by it, dated May 6, 1919, and recorded May 7, 1919, affecting lands in Washington Highlands, including that owned by Wetzel and covered by the mortgage referred to. The instrument upon which the claim for a lien was based, among other things, provided that all property in the Highlands should be subjected to an annual charge of not to exceed five mills per square foot of area. The power to fix the rate, enforce collection, and expend the money was granted to the Washington Homes Association. The instrument provided that the assessments should be paid annually in advance to Washington Highlands Company on the 31st day of December in each and every year, on which date such charge or assessment for the ensuing year shall become a lien upon the land and continue until paid. The deed to

Wetzel referred to this instrument. Wetzel and wife conveyed the property on November 21, 1930, to the defendant Marianne Wetzel. The lower court found that certain assessments fixed by the Washington Homes Association became liens on December 31, 1930, and December 31, 1931, respectively, and that such liens had priority over the first and second mortgage liens, referred to.

The Supreme Court of Wisconsin affirmed the judgment of the lower court and said: "Under the authorities, the instrument created a charge upon the land in the nature of a lien and amounting to an equitable lien upon the premises."

The court cited Jones on Liens, vol. 1 (3d Ed.) page 30, Pomeroy, Equity Jurisprudence, vol. 3 (4th Ed.) page 2983, and numerous cases to the effect that subsequent mortgages of the lands took with notice of the liens and took subject to them.

See *Brown* v. *Ford,* 120 Va. 233, 91 S. E. 145; *Pownal* v. *Taylor,* 10 Leigh 172, 173, 34 Am. Dec. 725; *Armour Fertilizer Works* v. *Taylor,* 129 Va. 1, 7, 105 S. E. 574, 576. Our conclusion is that an equitable lien against the lots in question was effected by the covenant in the deed and agreement referred to which became certain when the amount of the assessments were legally fixed by the assessing corporation, the appellee. *Id certum est quod certum reddi potest.* The appellant took title to the lots *cum onere.*

We now give heed to the defense that the assessments were not legally made, that is, that the steps actually taken by the appellee towards this consummation were not legal acts of the corporation and therefore they constitute no valid charge against the lots which the appellant is bound to pay.

The by-laws of Centre Hill Court, Incorporated, as originally adopted provided that its annual meetings should be held on the third Thursday of June in each year. The date of such meeting was changed by an amendment of the by-laws, at a meeting of the members of the corporation, held on June 28, 1923; which was the fourth Thursday of

that month rather than the third. The appellant urges that, for this reason, the amendment is invalid. It is unquestionably true that, where the by-laws require annual meetings to be held at a stated time, such time must be adhered to as to such meetings, but this does not prevent the directors, trustees, or members from holding special meetings whenever the business of the corporation makes it necessary or desirable for them to do so. See Fletcher, Cyc. Corp., vol. 2 (Perm. Ed.) section 399; *Ashley Wire Co.* v. *Illinois Steel Co.,* 164 Ill. 149, 45 N. E. 410, 56 Am. St. Rep. 187; *United Growers Co.* v. *Eisner,* 22 App. Div. 1, 47 N. Y. Supp. 906. If it were otherwise corporations might be seriously hampered in the transaction of their business. The minutes as to the particular meeting state that it was held, "pursuant to notice duly given."

"In the absence of evidence to the contrary, it will be presumed that proper notice of a meeting was given." Fletcher, Cyc. Corp., vol. 5 (Perm. Ed.) section 2010; *Wallace* v. *Inhabitants of First Parish in Townsend,* 109 Mass. 263; *Sargent* v. *Webster,* 13 Metc. 497, 46 Am. Dec. 743; *Hill* v. *Atlantic & N. C. R. Co.,* 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606.

In Cook on Corporations, vol. 3 (8th Ed.) section 595, page 2088, it was said: "Although the time of a meeting is fixed by charter, nevertheless the meeting may be held at a subsequent time and be valid."

In *Beardsley* v. *Johnson,* 121 N. Y. 224, 24 N. E. 380, the syllabus is as follows: "Provisions in statutes and by-laws requiring the election of directors of corporations to be held on a specified day are regarded as directory; the election, if not held on the regular day, may be held at a later day, and the directors then chosen, if there be no other irregularity or infirmity in their title, will be directors *de jure.*"

There is nothing in the minutes of the meeting on June 28, 1923, to indicate that the meeting was not held pursuant to notice duly given, and the recital therein to

that effect would seem, in the absence of evidence impeaching such recital, to be conclusive.

In Fletcher's Cyc. Corp. (Perm. Ed.) section 2023, it is said: "It will always be presumed in the absence of evidence to the contrary that a corporate meeting was regularly and fairly conducted and that provisions of the statutes, charter or by-laws were complied with."

In Cook on Corporations (7th Ed.) section 600, it is said: "It is a presumption of law that a proper and valid notice of a corporate meeting has been duly given to every stockholder and that the meeting itself was regularly and lawfully held. The burden of proof is therefore upon him who alleges want of notice or insufficiency of notice or attacks the regularity and validity of the proceeding."

See, also, Cook on Corporations, vol. 3, page 2111 (8th Ed.) section 606; Corpus Juris, vol. 14, page 922, section 1438.

It will be observed that the regular annual meetings for the years 1925, 1926, 1927, and 1928 were called in accordance with the 1923 amendment to the by-laws, and thus the regularity of the by-law in question was recognized.

As to the meeting of 1925, at which the assessment for that year was made, the minutes show that it was improperly called. It purported to be an adjourned annual meeting. At the regular annual meeting of the corporation a quorum of the members was not present and the adjournment was taken without a quorum. This action was not valid.

Fletcher, Cyc. Corp., vol. 2 (Perm. Ed.) page 181, section 401: "Unless the by-laws otherwise provide, if there is less than a quorum present, they cannot adjourn the meeting to any date whatever, * * *."

The subsequent assessment meeting, was, therefore, not an adjourned annual meeting, but it might have been a valid special meeting, if it had been called in accordance with the by-laws of the corporation. The call was issued or signed by the secretary and treasurer and approved by the president. There was no by-law or statutory authority for this.

On the contrary the by-laws provided for the calling of a special meeting by the trustees, or any member or members, owning at least five of the lots. There is nothing to show that the officials who made the call were trustees or that they owned at least five of the lots.

Again it is to be noted that the meeting was called for June 5, 1925, and the minutes recite that it was actually held on June 6, 1925. There is nothing in the evidence that is sufficiently explanatory of this irregularity which would cure it and make the meeting valid.

██ We think that the trial court was correct in its judgment that the meeting was not properly held and that the assessment for the year 1925 was invalid.

As to the meeting of June, 1926. The regular annual meeting was noticed for March 17, 1926, and the minutes recite the absence of a quorum and an adjournment to April 22, 1926. As we have said before, a number of members less than a quorum, cannot legally adjourn a meeting unless there be statutory or by-law authority therefor. It does not appear that a meeting was held on the adjournment day but it does appear that there was a meeting on May 14, 1926. It was stated that it was held pursuant to adjournment and that it was the regular annual meeting. The minutes contain this recital:

"Thereupon the president presented a duplicate original of notice dated May 10, 1926, which was sent to every member of the corporation calling attention to the adjourned meeting, which notice was ordered to be inserted in the minutes at this point, which is accordingly done."

██ "The notice, however, does not appear in the minutes. While the minutes of the meeting held on May 14th are entitled "Minutes of an Adjourned Annual Meeting," and it was stated that it was held pursuant to an adjournment, nevertheless it appears that notice of the meeting was given, and in accordance with the presumption, in the absence of evidence to the contrary, that a corporate meeting was regularly and fairly conducted and that the provisions of the statutes, charter or by-laws were complied with (see

Fletcher, Cyc. Corp. [Perm. Ed.] section 2023), it will be presumed that the meeting held on May 14, 1926, was a valid and properly held meeting, and consequently the assessment made at the 1926 meeting was valid.

The annual meeting of 1927 for March 16th of that year was properly noticed as an annual meeting but an adjournment was taken on account of the absence of a quorum, which, as we have said before, could not be legally done. There was a meeting, however, on April 7, 1927, which, though stated in the minutes to be an adjourned annual meeting, was in fact a special meeting. As such it was not called in accordance with the requirements of the by-laws. The notice or call was issued by the president of the corporation. The call or notice was invalid for the additional reason that it did not state the specific objects of the meeting or that an assessment would be made.

In Fletcher, Cyc. Corp. (Perm. Ed.) section 2009, it is said that the notice must state the business to be considered at special meetings, but not at general meetings, unless it is extraordinary or unless it is required by charter, statute or by-law. On page 2009 it is said: "In the case of special meetings the notice must state the business to be transacted. It is sometimes expressly so provided by the charter or by by-laws, but express provision is not necessary."

In Cook on Corporations (7th Ed.) vol. 2, section 595, page 1749, after laying down the rule that, where the meeting is to be held at a time not provided by the charter, the call must specify particularly the time and also the business, it is said: "Nor can an assessment be levied at a special meeting when the stockholders were not duly notified that the matter would come up for consideration"—citing *Atlantic Delaine Co.* v. *Mason,* 5 R. I. 463.

The 1927 assessment, for the reasons stated, was invalid. The assessment meeting for that year was also invalid because void proxies were counted to make a quorum. These will be specifically considered presently.

The 1928 meeting was invalid because it was held on April 19, 1928. The regular annual meeting should have

been held on the third Wednesday in March of that year, the time fixed by the by-laws. The actual meeting does not purport to have been held pursuant to an adjournment. If the actual meeting had been properly called and duly noticed, in accordance with the by-laws, it might be treated as a special meeting and thereby rendered valid. But this is not the case. The notice was signed by the president. The objects of the meeting were not stated, nor was the meeting called to be held at the principal office of the corporation.

Certain proxies were used in the 1927 and 1928 meetings to make up a quorum. One of these was executed by W. S. Young, executor. This proxy contains no express provision as to how the vote shall be cast and permits the person to whom it is given to vote as she may see fit. Such a proxy is void.

In Fletcher, Cyc. Corp., vol. 5 (Perm. Ed.) page 174, section 2054: "An executor may give a proxy where it contains an express direction as to how the votes shall be cast, but not a proxy which is a complete delegation of the executor's authority, and permits the person to whom it is given to vote as he sees fit."

See cases cited to support the text.

Another of the proxies was executed by T. J. Gills, who was not a lot owner, or member of the corporation, but whose wife owned one of the lots involved. The proxy does not purport to have been executed by or on behalf of his wife, and we cannot say that he had such authority as a result of the marital relation. We think that the modernistic trend negatives such an effect. The proxy was void.

Another of the proxies was executed by Robert Cabaniss, who was president of the Bollingbrook Construction Corporation, which owned four lots. Cabaniss owned all of the shares of stock of that corporation except two. He did not execute the proxy on behalf of the company, and it does not appear that any authority to do so had been conferred upon him. It was simply the individual proxy of Cabaniss.

In Fletcher, Cyc. Corp. (Perm. Ed.) section 25, it is said: "It is generally accepted that the corporation is an entity, distinct from the shareholders or members, and with rights and liabilities not the same as theirs individually and severally, and the corporation and its officers are not the same personality. * * * The foregoing rules obtain, even though one individual acquires the entire capital stock of a corporation or all but qualifying shares held by directors. He and the corporation are not one and the same, but are distinct and separate legal entities and must be so treated."

In *United States* v. *Milwaukee Refrigerator Transit Co.* (C. C.) 142 Fed. 247, 255, it is said: "A stockholder owning nearly all the stock cannot bind the corporation by a contract made in his individual capacity. *Donoghue* v. *I. & L. M. Ry. Co.*, 87 Mich. 13, 49 N. W. 512; *Finley Shoe & Leather Co.* v. *Kurtz,* 34 Mich. 89; *England* v. *Dearborn,* 141 Mass. 590, 6 N. E. 837."

Other and kindred questions of interest have been raised but to consider them in detail is unnecessary and would prolong this opinion to the point of tediousness.

Centre Hill Court, Incorporated, as has been pointed out, is a non-profit association. Its purposes are to beautify and make more convenient, habitable and attractive the city subdivision. As is frequently the case with such organizations, its management was largely in the control of public-spirited women, who appear to have been beset with difficulties in securing the active cooperation of the lot owners. Thus its corporate meetings were informal and irregular. Doubtless the value of the lots in question was augmented and their use and enjoyment made more secure by the efforts of this corporation but the present owner of the lots has planted its defense, in part, upon a secure legal footing that cannot be gainsaid. It follows that we hold that all of the assessments are invalid, except that of 1926, which we hold is valid, and it is an equitable charge or lien against the four lots owned or standing in the name of the appellant, Noremac, Incorporated, and that such lien is first in dignity except as to the lien of any unpaid taxes against said

lots. A decree will be entered by the trial court in accordance with the views expressed herein, and the case remanded for that purpose.

*Affirmed in part, reversed in part, and remanded.*