**In re TEXACO, INC., Texaco Capital, Inc., Texaco Capital, N.V., Debtors.**

**Bankruptcy Nos. 87 B 20142 to 87 B 20144.**

United States Bankruptcy Court, S.D. New York.

Aug. 16, 1988.

**624**

Weil Gotshal & Manges, New York City, for debtors.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Gen. Committee.

Keck Mahin & Cate, Chicago, Ill., for Equity Committee.

Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, for the Icahn Group.

LeBoeuf, Lamb Leiby & MaCrae, S. Lewis, P.C. Pension Trust, Bernstein Litowitz Berger & Grossmann, Milberg Weiss Bershad Specthrie & Lerach, Law Offices of Joseph Weiss, Wolf Haldenstein Adler Freeman & Herz, New York City, for various shareholders and derivative plaintiffs.

## DECISION ON FEE APPLICATION OF DERIVATIVE ATTORNEYS

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The plaintiffs' attorneys in state court derivative actions commenced on behalf of Texaco, Inc. have filed fee applications in the Texaco reorganization. These Derivative Attorneys seek $10,000,000 in fees and $165,630.84 in disbursements. The objectants, consisting of the equity holders and creditors committee, as well as individual shareholders of Texaco, Inc., assert the Derivative Attorneys did not benefit nor make a substantial contribution to the debtors' estates in compliance with the Bankruptcy Code, and request the application for fees be denied in full.

## FACTUAL BACKGROUND

1. In February 1984, Pennzoil filed an action in Texas state court against Texaco, claiming that Texaco tortiously interfered with Pennzoil's alleged contract to purchase Getty Oil. The jury returned a verdict against Texaco and on December 10, 1985, the Texas court entered judgment in favor of Pennzoil for approximately $10.5 billion ("Pennzoil Judgment"). In February 1986, the Texas Court of Appeals affirmed the Pennzoil Judgment, while reducing the punitive damage portion of the award by $2 billion.

2. On November 2, 1987, the Texas Supreme Court declined to grant Texaco's application for writ of error, concluding that no reversible error had been made by the lower Texas courts.

3. Upon the entry of the more than $10 Billion judgment against Texaco in the Texas state court, the first derivative action was commenced in the Delaware Chancery Court against Texaco's Board of Directors. Thereafter, but prior to Texaco filing its Chapter 11 petition in Bankruptcy, ten similar derivative actions were commenced in Delaware.

4. Two additional actions were filed by plaintiffs' counsel against Getty Oil Company, the former members of Getty Oil's Board of Directors, the J. Paul Getty Trust (the "Getty Interests") and the First Boston Corporation and Goldman Sachs & Co., the investment banking firms which represented Texaco and Getty Oil, respectively, in connection with the Getty Oil acquisition.

5. These stockholder derivative actions alleged, *inter alia*, fraud, breach of fiduciary duty and breach of representations and warranties against the Defendants arising from the liability incurred by Texaco as a result to the Pennzoil Judgment.

6. On April 12, 1987 the debtors filed their Chapter 11 petitions with this court.

7. On December 19, 1987, the debtors filed a Joint Plan of Reorganization which included an integrated settlement ("Joint Plan") with Pennzoil reducing the Pennzoil Judgment from $10 billion plus interest to a flat $3 billion figure.

8. On January 29, 1988, this court approved from the bench the debtor's disclosure statement, which decision was affirmed by Chief Judge Brieant in *In re Texaco, Inc.*, 82 B.R. 678 (S.D.N.Y.1988). On the morning of March 22, 1988, after voluminous discovery requests, which included numerous depositions and the production of thousands of documents, the Derivative Attorneys and the debtors entered into a stipulation whereby the Derivative Attorneys agreed to withdraw the shareholder derivative plaintiff objections to the confirmation of the joint Plan of reorganization. In exchange, Texaco agreed that it would not object to the fee applications by the derivative attorneys up to $10 million plus disbursements. The confirmation hearing commenced on March 22, 1988 and the Joint Plan was confirmed by this court on March 23, 1988. *In re Texaco, Inc.*, 84 B.R. 893 (Bankr.S.D.N.Y.1988).

9. Applications for fees by professionals were filed and a hearing was held on June 27, 1988. The equity holders committee, the creditors' committee and certain shareholders filed objections to the Derivative Attorneys' fee application which requested $10 million in fees plus $165,630.84 in expenses. The hearing with regard to the Derivative Attorneys' application was adjourned to July 18, 1988, at which time a trial was conducted by the parties.

### DISCUSSION

The fee application submitted by the 19 Derivative Attorneys claims compensation in the amount of $10 million in fees and $165,630.84 in disbursements. The fees and disbursements include work performed by the Derivative Attorneys pre—and post-petition. To justify the fees incurred, the Derivative Attorneys claim that the filing of the derivative actions and the subsequent work performed on behalf of the shareholder derivative plaintiffs had substantial merit and value and were a benefit to the debtors' estate. They argue that the filing of the derivative actions pre-petition and prior to the tolling of the Delaware statute of limitations, the statute which the Derivative Attorneys determined was applicable to these actions, preserved what

could have been potentially valuable assets of the debtors.

Regarding the fees incurred post-petition, the Derivative Attorneys assert that, but for their actions, the debtors' equity holders would not have received sufficient disclosure upon which to make an informed decision when voting on the Joint Plan of Reorganization. This disclosure, it is argued, provided a substantial contribution and benefit to the estate. Additionally, the Derivative Attorneys argue that a substantial contribution resulted from their action because Pennzoil agreed to decrease its settlement from $4.1 billion $3.0 billion, partly attributable to the allowance of the release and indemnification provision in the Joint Plan.

The Derivative Attorneys acknowledge that this court retains discretion to determine fees incurred by their efforts. However, they argue that 11 U.S.C. § 503(b) and the underlying caselaw is the applicable standard only to the extent it is applicable to post-petition fees incurred. They cite the terms of the Joint Plan which states that "... to the extent permitted by *applicable law*", derivative counsel shall be allowed to seek compensation, and argue that Delaware is the "applicable law". (emphasis added). They claim that Delaware law, which applies a "substantial benefit" approach when evaluating derivative counsel's entitlement to an award of their fees and expenses, is the standard upon which the judge must determine the award of fees for pre-petition efforts. They claim this standard is consistent with that of 11 U.S.C. § 503(b)(4).

The objectants include the equity committee, Grant S. Lewis, the P.C. Pension Fund, the General Creditors Committee, and Carl Icahn and the Icahn Group. The objectants ask this court to deny the Derivative Attorneys' application in full arguing that no action on behalf of the Derivative Attorneys resulted in a benefit or substantial contribution to the debtor's estate pursuant to 11 U.S.C. § 503(b) or under Delaware law. The objectants suggest that it is reprehensible for the Derivative Attorneys

to seek compensation for services performed under the guise of a benefit or substantial contribution to the estate because the actions by the Derivative Attorneys were obstructive to the confirmation of the Joint Plan. Grant S. Lewis and P.C. Pension Trust argue further that the Derivative Attorneys' simultaneous negotiation of settlement terms and fees create an irreconcilable conflict of interest citing *Obin v. Distict No. 9 of Int'l Ass'n of Machinists & Aerospace Workers,* 651 F.2d 574, 582 (8th Cir.1981), *Prandini v. National Tea Co.,* 557 F.2d 1015, 1021, n. 7 (3d Cir.1977), and *Regalado v. Johnson,* 79 F.R.D. 447, 451 (N.D.Ill.1978). Furthermore, Lewis argues the stipulation between Texaco and the Derivative Attorneys constitutes a "clear sailing" agreement which requires denial of the derivative Attorneys' application. Lewis requests this $10,000,-000 dollar fund created for payment of the Derivative Attorneys' fees be awarded to Texaco.

Additionally, the objectants argue that even if this court determines that the Derivative Attorneys are entitled to fees, this court must determine the reasonableness of these pre- and post-petition fees pursuant to 11 U.S.C. § 503(b)(3)(D) and the litany of cases decided thereunder.

### Substantial Contribution

Prior to the filing of the debtors' Chapter 11 petition the Derivative Attorneys filed the respective derivative actions on behalf of the shareholder derivative plaintiffs. The hours billed by the Derivative Attorneys pre-petition totalled approximately 6776.5.

From the time that Texaco filed its Chapter 11 petition on April 12, 1987, to the filing of the Joint Plan of Reorganization and Integrated Settlement on December 19, 1987, the Derivative Attorneys were basically dormant in their pursuit of the shareholder derivative plaintiff claims. The 19 Derivative Attorneys billed a total of 471.-70 hours from the time of the filing of the bankruptcy petition by the debtor to the filing of the Joint Plan. However, upon the filing of the Joint Plan, with its accompanying release and indemnification provision, the Derivative Attorneys, on behalf of their respective causes, were resuscitated.

The filing of the Joint Plan served as a catalyst for action by the Derivative Attorneys. This action resulted from the condition of the Pennzoil settlement which required the discontinuance of the derivative actions and the release and indemnification of the board of directors and officers of all the Getty Interests, Texaco and Pennzoil, and the investment banking firms involved in the Getty Acquisition. The shareholder derivative plaintiff's actions were pursued with alacrity by the Derivative Attorneys resulting in a total of 813 hours billed from the filing of the Joint Plan to the approval of the disclosure statement by this court, January 29, 1988, and a total of 2002.35 hours billed from the court approval of the disclosure statement to the confirmation hearing commencing on March 22, 1988. The hours billed postpetition totalled 5031.-05 for a Lodestar rate of $601,336.59.

The Derivative Attorneys claim that from the time the Joint Plan was filed they sought to weed out any and all information regarding the actions by all derivative defendants in order to afford full disclosure to the equity security holders who were deemed an impaired class under the Joint Plan and therefore entitled to accept or reject the Joint Plan. They construe the services performed to this end resulted in a substantial contribution and benefit to the debtors' estates. These services included the initial pre-petition act of timely filing the derivative action prior to the tolling of the Delaware three year statute of limitations for fraud and after the filing of the disclosure statement and Joint Plan. The Derivative Attorneys sought to acquire further disclosure in the Joint Plan which would indicate who initiated the release and indemnification provision, and what were the repercussions of these releases. Furthermore, the Derivative Attorneys' reason that their advice to their clients, the shareholder derivative plaintiffs, to withdraw their objections to the Joint Plan resulted in the decrease of the Pennzoil demand from $4.1 billion to $3.0 billion, which rep-

resents a substantial contribution to the debtors' estate.

### Administration Expenses

█ The first issue which must be resolved is whether the Derivative Attorneys services resulted in a substantial contribution to the debtors' estates within the meaning of 11 U.S.C. § 503(b)(3)(D). If a substantial contribution was made, this court must determine whether both pre- and post-petition fees may be compensated under 11 U.S.C. § 503(b)(4).

11 U.S.C. § 503 states:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11;

Section 503(b) of the Bankruptcy Code is "derived from Bankruptcy Act Sections 242 and 243". *See* H.R. No. 95–595, 95th Cong., 1st Sess. 355 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6311. The phrase "substantial contribution", which appeared in former Sections 242 and 243 of the Bankruptcy Act, was not interpreted as requiring such contribution as will lead to confirmation of a plan. In many cases, it has been determined that there is a substantial contribution if the action of the creditor or other party in interest in opposition to a plan, especially in the instance of the discovery of fraud in connection with the case, whether successful or unsuccessful. Such parties are entitled to compensation within the meaning of the phrase "substantial contribution". *See Dickenson Industrial Site, Inc. v. Cowan,* 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 (1940); *Matter of Prudence Bonds Corp.,* 122 F.2d 258 (2d Cir.1941); *In re Lennox Metal Manufac-*

*turing Co.,* 263 F.2d 891 (2d Cir.1959) *See Also Finn v. Childs Co.,* 181 F.2d 431 (2d Cir.1950); *In re McGann Mfg. Co.,* 188 F.2d 110 (3d Cir.1951); *In re Solar Mfg. Company,* 215 F.2d 555 (3d Cir.1954); 3 Collier On Bankruptcy ¶ 503.04 at 503–49 (1987).

This court believes the Derivative Attorneys made a substantial contribution to the debtors' estate post-petition and also conferred a benefit to the debtors' pre-petition. Although the objectants claim the Derivative Attorneys were merely obstructionists to the confirmation of the Joint Plan, the court disagrees with this characterization. The Derivative Attorneys were hired by Texaco shareholders to file derivative actions against the officers and directors of Texaco. Prior to the filing of the debtors' Chapter 11 petition, the derivative shareholders plaintiffs requested that an investigation of the officers' and directors' conduct be performed pursuant to Delaware law. The Derivative Attorneys assert that Texaco told the derivative shareholder plaintiffs that an investigation would be conducted and everything would be "taken care of". The Derivative Attorneys claim this is the reason why they were generally inactive in their representation of the derivative shareholder plaintiffs immediately preceding the debtors' Chapter 11 petition and prior to the filing of the Joint Plan. It was not until the filing of the Joint Plan, together with the releases and indemnifications, that the Derivative Attorneys sought further disclosure and investigation. The derivative shareholder plaintiffs were concerned about whether the release and indemnification provisions were the self-serving suggestion by the Texaco officers and directors. Accordingly, this court believed that the shareholders who voted on the Joint Plan were entitled to information as to the origin of the release and indemnification provision.

The Derivative Attorneys also claim that the existence of the provision for releases and the discontinuance of the derivative suits was responsible for Pennzoil's willingness to reduce its settlement demand from $4.1 billion to $3 billion. The court does

not find that the releases and derivative suit discontinuance was either solely or substantially responsible for Pennzoil agreement to the $3 billion figure. The settlement was arrived at when this court permitted the equity holders committee and the creditors committee to negotiate directly with Pennzoil, with the understanding that if a settlement figure was mutually agreed upon, the court would terminate Texaco's exclusive right to propose a plan of reorganization and would entertain a competing plan proposed by the statutory committees and Pennzoil. Texaco did not become a party to the Joint Plan until after the statutory committees had already arrived at a tentative settlement with Pennzoil.

There was no proof that the release of Texaco's officers and directors and the discontinuance of the derivative suits played any role in causing Pennzoil to reduce its demand from $4.1 billion to $3 billion. The concept of releases and the discontinuance of the derivative suits was not initiated by Texaco. The creditors committee had previously suggested a "base-cap" plan which included releases and the discontinuance of the derivative actions. Pennzoil made clear that whatever settlement figure was ultimately agreed upon, it did not want to be involved in any further litigation involving Texaco's acquisition of the Getty Company's stock. The difference between the $4.1 billion proposal and the $3 billion settlement cannot be regarded as a benefit obtained by Texaco as a result of the inclusion of the provision for releases and derivative suit discontinuances in the Joint Plan.

The General Creditors Committee argues that the Derivative Attorneys are not entitled to compensation according to the fifth circuits decision in the *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249 (5th Cir.1986). In this case, derivative attorneys sought compensation under 11 U.S. C. § 503(b)(3)(D) and § 503(b)(4). In *Consolidated Bancshares* the derivative suits were filed prior to the debtor's commencement of its Chapter 11 case. The debtor proceeded to file a plan for reorganization which the derivative attorneys opposed. This plan provided for a 100% payout of all

debt and a $5.4 million settlement fund to satisfy the claims of equity security holders. The court held that the derivative litigants had not only failed to make a substantial contribution to the debtor's estate, but interfered and obstructed the confirmation of the plan.

The fifth circuit based its decision on the following factors: (1) A shareholder can only maintain a derivative suit when the complaint alleges that the shareholder requested the trustee [or debtor in possession] to bring suit, *citing Kemper v. American Broadcasting Co.*, 365 F.Supp. 1272 (S.D.Ohio 1973). The derivative attorneys in that case neglected to demand that the debtor prosecute the cause of action. Thus the debtor had not abandoned the action, with the result that the suit could be dismissed; (2) The derivative actions never came close to being ready for trial; no depositions and negligible written discovery occurred; (3) The derivative attorneys did not participate in meetings of the statutory Committees, failed to consult with Committee counsel about the derivative action, and never participated in the multi-party negotiations to formulate a plan.

The facts in this case differ greatly from those in the *Consolidated Bancshares* case. Prior to the debtors' filing their Chapter 11 petitions, the derivative shareholder plaintiffs requested that the debtors conduct an investigation of the actions of its officers and directors pursuant to Delaware law. The Derivative Attorneys claim they discontinued work on the cases because Texaco assured them that it would perform the investigation. An investigation was not conducted by the debtor until after the disclosure statement and Joint Plan were filed. This investigation, when completed, was not documented in any fashion. The fact that the Derivative Attorneys were concerned that the debtors' were willing to allow the release and indemnification of the officers and directors of the debtors without having conducted a proper investigation, and because the origin of the release and indemnification provision was at issue, it was not unreasonable

that the Derivative Attorneys should demand an investigation on behalf of their clients. Although the debtor did not abandon these claims to the Derivative Plaintiffs pursuant to 11 U.S.C. § 554, it also did not conduct an investigation until, at least, a year and a half later after such an investigation had been requested. As stated in *Kemper v. American Broadcasting Co.*, 365 F.Supp. at 1274, "[o]nly demonstrable futility or the actual refusal of a demand ... can abrogate the [Federal] Rule 23.1 prerequisite of such a demand for prosecution of a corporate cause of action". Obviously, the Derivative Attorneys may have viewed their requests as futile. Additionally, the debtors' willingness to allow the release and indemnification of its officers and directors served as an abandonment of the derivative claims justifying the services of the Derivative Attorneys after the filing of the Disclosure Statement and Joint Plan.

The taking of depositions and written discovery were basically non-existent for the same reasons; the debtors stated they would perform the investigation. Depositions were taken and discovery certainly occurred after the filing of the Joint Plan.

The Derivative Attorneys may not have been involved in the formulation of the Joint Plan but they were responsible for additional disclosure to the equity holders and they did consult with the equity committee about the derivative actions. The equity committee had not stated that it intended to pursue or withdraw these actions and, in fact, never came out with a clear stance on the merit of these actions. Because the equity committee basically declined responsibility for the pursuit or withdrawal of these actions, it was not unreasonable for the Derivative Attorneys to pursue these actions on behalf of their respective clients.

Finally, the debtors' Joint Plan in this case did not include a settlement fund to be paid to the equity security holders. The Joint Plan included a settlement with Pennzoil which was in the shareholders' best interest, rather than pursuing certiorari to the United States Supreme Court. However, it was only because Pennzoil stated

that the release and derivative suit discontinuances were conditions to the settlement that these actions were discontinued. No monetary benefit was conferred upon the equity holders.

Therefore, this court finds that the work performed by some of the Derivative Attorneys, which resulted in adequate disclosure to the shareholders and elucidation of the facts, was a substantial contribution to the debtors' Chapter 11 cases. The Derivative Attorneys did not need to determine that the Texaco board suggested the release and indemnification provision in order to demonstrate a substantial contribution to the debtors' Chapter 11 cases. Although the Derivative Attorneys acted on behalf of their clients, the derivative actions, if successful, represented potential value to the estate and would have benefitted all shareholders. This court recognized that the shareholders were in jeopardy in the reorganizational process because of the modified absolute priority rule expressed in 11 U.S.C. § 1129(b)(2)(B)(ii). It was for these reasons this court deemed the shareholders an impaired class entitling them to vote on the confirmation of the Joint Plan. The pursuit of information by the some of Derivative Attorneys which served to protect the rights of all the shareholders was a substantial contribution and benefit to the debtors' estate. To find that all the efforts made by the Derivative Attorneys in pursuit of their clients' derivative claims was obstructive, would be the equivalent of this court determining that the derivative actions were not meritorious for which the court has no factual basis.

■ Regarding the fee discussions between the debtors and the Derivative Attorneys, the debtors' agreement not to object to the fee applications filed by the Derivative Attorneys below $10 million did not create an irreconcilable conflict of interest. There was no indication that settlement negotiations were being conducted by and between the Derivative Attorneys and the debtors. In fact, the issue of the liability of the officers and directors of Texaco and Getty and the investment banking firms became a non-issue when the release

and indemnification provision became a condition to the settlement agreement between Pennzoil and Texaco. Therefore, the only issue which existed was whether the provisions for releases and discontinuances of the derivative actions were included in the Joint Plan in good faith. The Texaco shareholders, as well as this court, were entitled to full disclosure regarding the origin of these provisions. There was no conflict of interest because no settlement negotiations were involved.

The objection by Grant Lewis and the P.C. Pension Trust, which concerns the alleged "clear sailing" provision in the agreement between the Derivative Attorneys and the debtor, and basically estops Texaco from objecting to a fee application which does not exceed $10 million, is also not sustainable. Although the debtor could not object to the fee application, there has certainly been no "clear sailing" for the Derivative Attorneys in acquiring approval of their fee applications. Any party in interest, pursuant to 11 U.S.C. § 1109, may appear and be heard in any motion or application in the Bankruptcy Court. Even though the agreement may have resulted in Texaco's inability to object, this is not a case where fees have been agreed upon, as is obvious from the objections filed and considered by this court. The debtor did not accede gratuitously to the Derivative Attorneys' request for a 'clear sailing' clause, which would be at the expense of the shareholder derivative plaintiffs. *Malchman v. Davis*, 761 F.2d 893, 908 (2d Cir.1985), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986). Both the debtor and the Derivative Attorneys were aware that the equity committee, the creditors' committee and other parties in interest of the bankruptcy could object, not to mention the bankruptcy court, which must determine what constitutes a reasonable fee independent of any agreement by the debtor not to object to the fee applications submitted by the Derivative Attorneys. *In re Automatic Spring Products, Inc.*, 50 B.R. 6 (Bankr.S.D.Fla.1985). Therefore, there was no "clear sailing" for the Derivative Attorneys nor did the debtor compromise any interests of the estate.

### Reasonable Fees

In light of this court's determination that the debtors' estates were benefitted by the pre-petition filing of the Derivative actions which preserved for the debtors' estates a potentially valuable asset, and that there was a substantial contribution to the debtors' estate as a result of the Derivative Attorneys' actions with regard to adequate disclosure and investigation into the origin of the releases and derivative suit discontinuances in the Joint Plan, the issue which must now be resolved is the applicable standard for determining the reasonable fees.

#### (a) Pre-petition Fees

■ Determination of compensible administrative expenses is within the discretion of the bankruptcy court. *In re Verco Industries*, 20 B.R. 664, 665 (BAP 9th Cir. 1982). Bankruptcy Code § 503(b) consists of those expenses incurred during the pendency of the bankruptcy. *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988). Expenses incurred prior to the filing of the petition in bankruptcy are also compensable pursuant to 11 U.S.C. § 503(b). *In re Lister*, 846 F.2d at 57; *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 566 (Bankr.D.Utah 1985). In every case where pre-petition expenses were allowed, a demonstrable benefit to the estate was shown. *In re Jensen–Farley Pictures, Inc.*, 47 B.R. at 571. The benefit was required to be substantial and courts carefully scrutinize such requests. *In re Jensen Farley Pictures, Inc.*, 47 B.R. at 571 *citing Bass v. Quittner, Stutman & Treister*, 381 F.2d 54, 59 (9th Cir.1967). The "direct benefit" test used by courts for fee applications under the Bankruptcy Act's predecessor sections to 11 U.S.C. § 503(b), remains the touchstone in a "substantial contribution" analysis. The appropriate test under Section 503(b) is whether the services substantially contributed to a successful result, that is, an actual and demonstrable benefit to the debtor's estate, the creditors and, to the extent relevant, the stockholder. *In re Lister*, 846 F.2d at 57; *In re Jensen Farley Pictures, Inc*, 47 B.R. at 569; *See In re United Puerto*

*Rican Food Corp.*, 41 B.R. 565, 574 (Bankr.E.D.N.Y.1984); *In re Richton International Corp*, 15 B.R. 854 (Bankr.S.D. N.Y.1981). However, compensation for fees incurred pre-petition must substantially contribute to the administration of the debtors' estates post-petition.

■ The fees incurred by the Derivative Attorneys pre-petition are not compensable pursuant to 11 U.S.C. § 503(b). Any pre-petition fees to be awarded must be awarded pursuant to Delaware law and the "substantial benefit" test. *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876 (Del. Supr.1980). Post-petition fees may be compensated pursuant to 11 U.S.C. § 503(b)(3) & (4).

(b) Pre– and Post–Petition Compensation

Because the debtor received a substantial benefit pre-petition as a result of the filing and resulting preservation of the derivative actions, and because the debtor received a substantial contribution as a result of the disclosure to both the shareholders and the court, reasonable compensation may be awarded for the services performed which actively contributed to the benefit derived by the debtor pre- and post-petition.

■ Only those Derivative Attorneys who actively participated in the reorganization cases are entitled to compensation. Some of the Derivative Attorneys never took any active role in these Chapter 11 cases or filed any pleadings; the derivative shareholder plaintiffs were adequately represented by those counsel who actively participated in the Chapter 11 cases. The fact that each Derivative Attorney represented shareholders does not mean that the estate should compensate every Derivative Attorney for behind the scenes activity. *In re Texaco, Inc.*, 91 B.R. 222, 223 (Bankr.S.D.N.Y. 1988).

■ The fact that the Derivative Attorneys selected one of the law firms to appear in court and speak on behalf of all the derivative shareholder plaintiffs' does not mean that the those Derivative Attorneys which did not make court appearances and contribute substantially to the disclosure process are entitled to compensation. Furthermore, duplicative work performed by the Derivative Attorneys pre- and post-petition will not be compensated. *See Soler v. G.U., Inc.*, 658 F.Supp. 1093, 1096 (S.D.N. Y.1987); *In re General Oil Distributors*, 51 B.R. 794, 800–02 (Bankr.E.D.N.Y.1985). This court will not compensate the Derivative Attorneys for time spent reading the newspapers to keep abreast of the Texaco bankruptcy or for general bankruptcy research. Such information may be helpful to the Derivative Attorneys but the time involved obtaining this information does not constitute a substantial contribution to these Chapter 11 cases.

■ This court will award pre-petition fees based upon the "substantial benefit" standard allowable under Delaware law. The Derivative Attorneys will be entitled to file proofs of claim as unsecured creditors. This court believes that the only benefit conferred pre-petition was the filing of the derivative actions in a timely fashion. Only one derivative action was required to preserve the debtors' rights against the defendants in the derivative actions. A fee of $100,000 will be allowed to cover the legal services incurred to investigate, research and file one derivative action on behalf of the debtors, against the debtors' officers and directors, the Getty Oil Company, Getty former officers and directors, the J. Paul Getty Trust, the First Boston Corporation and Goldman Sachs & Company. This amount is to be divided evenly between the 19 Derivative Attorneys.

■ The fees incurred post-petition are compensable pursuant 11 U.S.C. § 503(b)(4). All post petition fees which are compensable pursuant to 11 U.S.C. § 503(b) must be scrutinized in accordance with the factors expressed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which holds that in assessing the reasonableness of attorney fees the court must consider:

(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion

of other of employment by the attorney due to the acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The undesirability of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714. This court will not allow compensation for duplicative services or passive behind the scenes work which did not affirmatively contribute to the Chapter 11 cases. No compensation will be allowed for time spent by the derivative attorneys in meetings with the other Derivative Attorneys. The only acts which resulted in a substantial contribution to the debtors' estate were: (1) The submission of briefs regarding the issues of the releases and the discontinuance of the derivative actions during the pendency of both the disclosure and confirmation hearings; and (2) Court appearances at the disclosure hearings depositions relevant to the issues to be raised at the confirmation hearings and appearances at the approval of the disclosure statement and confirmation hearings. There will be no compensation for legal services performed by the derivative attorneys after the confirmation hearings.

■ This court does not believe that the Derivative Attorneys are entitled to a 395% premium for their services or that their contribution to these Chapter 11 cases justify an award of $10 million, as claimed by them. Nor will attorneys who have submitted patently insufficient time sheets be awarded compensation for services rendered.

In reviewing the time sheets submitted by the Derivative Attorneys in accordance with the *Johnson* factors and taking into consideration any and all duplicative services, this court determines the reasonable fees to be awarded for work which substantially contributed to the debtors' estate totals $252,800 for fees and $165,630.84 for disbursements. The following attorneys will share in the award in the following amounts which is based upon this court's determination of each firm's contribution:

| Goodkind, Wechsler, Labaton & Rudoff | Fees | $50,000 |
| | Expenses | $35,593.17 |
| Milberg, Weiss, Bershad, Specthrie & Lerach | Fees | $40,000 |
| | Expenses | $36,514.17 |
| Stull, Stull & Brody | Fees | $30,000 |
| | Expenses | $17,332.62 |
| Law Offices of Joseph Weiss | Fees | $36,000 |
| | Expenses | $ 8,783.50 |
| Bernstein, Litowitz, Berger & Grossman | Fees | $36,000 |
| | Expenses | $11,883.62 |
| Wolf, Haldenstein, Adler, Freeman & Herz | Fees | $25,800 |
| | Expenses | $17,980.67 |
| Anderson, Russell, Kill & Olick | Fees | $20,000 |
| | Expenses | $ 1,755.04 |
| Greenfiled & Chimicles | Fees | $15,000 |
| | Expenses | $ 1,923.23 |

The following firms will not receive any compensation for their services because they submitted insufficient or illegible time sheets:

| Kohn, Savett, Klein & Graf | Expenses | $7,951.64 |
| Law Offices of Alvin J. Ivers | Expenses | $ 281.00 |

■ The following firms are not entitled to compensation because the services performed were passive, behind the scenes acts which did not affirmatively substan-

tially contribute to the debtors' estates. Such services include reviewing newspapers, motion papers, reading depositions and conducting telephone conferences with other attorneys.

| | | |
|---|---|---|
| Zwerling, Schachter & Zwerling | Expenses | $2,420.38 |
| Heiman, Aber & Goldlust | Expenses | $4,653.00 |
| Hill, Parker, Franklin, Cardwell & Jones | Expenses | $5,536.54 |
| Kirk & Carragan, P.C. | Expenses | $3,889.38 |
| Gross, Sklar & Metzger | Expenses | $ 452.81 |
| Law Offices of Robert D. Allison | Expenses | $3,428.70 |
| Levin & Fishbein, Sedran & Berman | Expenses | $3,449.82 |
| Schoengold & Sporn | No listing of expenses | |
| Harvey Greenfield, Esq. | Expenses | $1,801.55 |

The Derivative Attorneys pre-petition claims totalling $100,000 are general unsecured claims for which they may file proofs of claims. The above post-petition awards are administration claims and are to be compensated with other administration claims. Total fees and disbursements are $518,430.84.

SETTLE ORDER on notice.