**In re ALERT HOLDINGS INC., et al., Debtors.**

**Bankruptcy Nos. 91 B 15708 to 91 B 15711, 92 B 40331 to 92 B 40337.**

United States Bankruptcy Court, S.D. New York.

Aug. 18, 1993.

Willkie Farr & Gallagher by Alan Lipkin, New York City, for debtors and debtors in possession.

Battle Fowler by Douglas Furth, New York City, for the Official Committee of Ltd. Partners of Alert Income Partners III, Ltd., Alert Income Partners IV, Ltd., and Alert Income Partners V, Ltd.

Mudge Rose Guthrie Alexander & Ferdon by Lorie Beers, New York City, for the L.P. Oversight Committee.

Calfee Halter & Griswold by Joseph Carney, Cleveland, OH, for Brian Cohn.

## MEMORANDUM DECISION ON CONTESTED § 503(b) APPLICATIONS

TINA L. BROZMAN, Bankruptcy Judge.

When I signed the order confirming the chapter 11 plan in these cases, I thought that the dust had finally settled. Not quite, for I had still to pass on applications for compensation. Most of the fee-related disputes were resolved through negotiation. But two remain, the disputed applications pursuant to section 503(b) filed by one Brian Cohn, a dissident member of the Committee of Limited Partners (the Official Committee), and by the self-styled Limited Partners' Oversight Committee (the LPOC) formed largely at the behest of Mr. Cohn. The debtors (collectively called Alert) and the Official Committee object to any award to these applicants.

### I.

I have laid out in an earlier opinion just how the Alert companies function. *See Alert Holdings, Inc. v. Interstate Protective Services, Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 197 (Bankr.S.D.N.Y. 1992). For today's purposes, suffice it to say that Alert provides electronic security monitoring for homes and businesses. The Alert entities filed for chapter 11 relief in late 1991/early 1992 and their cases were procedurally consolidated. In February, 1992, the Official Committee was appointed.

Mr. Cohn, who is a broker-dealer, was disenchanted with the composition of the Official Committee, some of whose members were shareholders of one of the debtors. (The shareholders ultimately had their interests eliminated under the confirmed plan.) Mr. Cohn was also unhappy about the level of communication emanating from the Official Committee to its constituency and spoke his mind to certain broker-dealers. This discontent led certain limited partners to form the LPOC, ostensibly to protect the rights of and insure the presence of the limited partners' voices in the reorganization process.

In March, 1993, the debtors filed their disclosure statement. Among the many who voiced their objections to the debtor's disclosure statement was the LPOC, which filed a 15 page objection. The LPOC claimed that the statement provided inadequate information with respect to: 1) the debtors' going concern value; 2) the distribution to the limited partners under the debtors' plan; 3) the terms of the proposed settlement of the multidistrict litigation which consolidated actions brought by various limited partners against the debtors and their former officers and directors; 4) confirmation under the cramdown provisions of section 1129 of the Code; and 5) means for plan implementation. Most of the objections, the majority of which had also been raised by other parties in opposition, were overruled. However, the debtors did make certain revisions to their disclosure statement, after which I approved it as containing adequate information. I later confirmed the debtor's plan, overruling the objections of the LPOC. (Cohn did not file any objection to confirmation of the plan.)

Asserting that they made a substantial contribution to the reorganization of Alert, Cohn and the LPOC seek compensation pursuant to section 503(b) of the Bankruptcy Code. Cohn seeks a total of $125,000 (he initially sought $200,000), consisting of approximately $87,000 in lost opportunities occasioned by the time he has devoted to these cases, $2,700 in nonlegal expenses, $23,000 in fees and expenses paid to Calfee, Halter & Griswold (Calfee), and $11,500 in fees and expenses paid to Thatcher, Proffitt & Wood. Cohn says he contributed to the reorganization in a number of ways:

(i) He helped spawn the multidistrict litigation by introducing one of his clients, Asher Rabinowitz, to the law firm Milberg Weiss Bershad Specthrie & Lerach (Milberg Weiss), which eventually became lead counsel in the multidistrict litigation. Thus, Cohn concludes, he aided in the resolution of that complex litigation (notwithstanding that he opposed the settlement).

(ii) He helped form the LPOC, on which he served as a member.

(iii) He found two third parties interested possibly in purchasing the debtors. (Neither of these parties made an offer to the debtors, albeit that Cohn places the responsibility for that outcome at Alert's feet. In any event, it was the LPOC and not Cohn that objected to Alert's disclosure statement as containing inadequate information with respect to these potential purchasers.)

(iv) He recommended that the LPOC hire Thomas Gleason, an industry expert, to evaluate the debtors' businesses.

(v) He expended considerable effort in putting together and filing a class action proof of claim. (If it had any impact in these cases, Cohn has not demonstrated what that impact was.)

The LPOC seeks a substantial contribution award of approximately $191,560, representing $51,040 in non-legal expenses, $92,055 in legal fees, $7,500 in legal expenses, $26,900 for Calfee's legal fees and $13,900 for Calfee's legal expenses. The LPOC argues that its conduct facilitated the dissemination of information to the debtors' limited partners. The LPOC filed a lengthy objection to the debtors' disclosure statement and had its counsel prepare a motion, never filed or prosecuted, for the appointment of a chapter 11 trustee. In addition, the LPOC brought to my attention one unfortunate instance where the Official Committee asked me to limit notice to the limited partners asserting that full notice would be unduly burdensome without informing me that just two days earlier the chairman of the Official Committee had sent a mass mailing to these same limited partners. The LPOC claims to have consistently acted in an effort to maximize values in these cases through exploration of reorganization alternatives; although the LPOC still disputes the various constituencies' chosen means of reorganization, the LPOC stands firm in its belief that its efforts brought this case to a speedy conclusion.

## II.

■ Section 503(b) of the Bankruptcy Code provides that a creditor who has made a substantial contribution to a bankruptcy case shall receive an administrative expense claim equal to its reasonable fees and necessary expenses, and, if applicable, its counsel's reasonable fees and expenses. 11 U.S.C. § 503(b)(3)(D) and (b)(4); *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y.1989), *aff'd*, 1991 WL 67464 (S.D.N.Y.1991). Although the term "substantial contribution" is not defined in the Code, courts have found that an applicant satisfies the substantial contribution test when it has provided "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." *U.S. Lines*, 103 B.R. at 429 (citing *In re McLean Industries, Inc.*, 88 B.R. 36, 38 (Bankr.S.D.N.Y. 1988)); *In re Rockwood Computer Corp.*, 61 B.R. 961, 965 (Bankr.S.D.Ohio 1986).

■ The substantial contribution test is intended to promote meaningful creditor participation in the reorganization process, but not to encourage mushrooming administrative expenses. *See In re Baldwin-United Corp.*, 79 B.R. 321, 338 (Bankr. S.D.Ohio 1987). Each § 503(b) applicant must prove by a preponderance of the evidence that the services it rendered for which it seeks compensation provided a substantial benefit to the estate. *U.S. Lines*, 103 B.R. at 429, *citing In re Hanson Industries, Inc.*, 90 B.R. 405, 409 (Bankr.D.Minn.1988); *see In re Jack Winter Apparel, Inc.*, 119 B.R. 629, 633 (E.D.Wis.1990); *see In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr. S.D.Cal.1988). Compensable services are those which facilitate progress of the case, *In re K-Fab, Inc.*, 118 B.R. 240, 242 (Bankr.M.D.Pa.1990), rather than those which retard or interrupt. *In re Richton International Corp.*, 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981). Factors which the courts have considered in determining whether an applicant has made a substantial contribution in a bankruptcy case include: whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others. *In re FRG, Inc.*, 124 B.R. 653, 658 (Bankr. E.D.Pa.1991); *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 194 (Bankr.S.D.Tex.1989).

■ Benefits which have been found to be insubstantial include those services which would merely deplete the assets of the estate without providing a corresponding greater benefit. *U.S. Lines*, 103 B.R. at 429. "Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests." *U.S. Lines*, 103 B.R. at 430 (citing *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 571 (Bankr.D.Utah 1985)); *accord In re Sound Radio, Inc.*, 145 B.R. 193, 208 (Bankr. D.N.J.1992). Whereas services that confer a significant and demonstrable benefit upon the reorganization process which have not been rendered solely on behalf of a creditor's own interest should be compensated, *GATX Terminals Corp. v. Tarricone (In re Tarricone, Inc.)*, 83 B.R. 253, 255 (Bankr.S.D.N.Y.1988), extensive participation in a case, without more, is insufficient to compel compensation. *McLean*, 88 B.R. at 38. And efforts undertaken by creditors solely to further their own self-interest are not compensable under section 503(b). *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988). The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate. Compensation must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate. *Richton*, 15 B.R. 854. Thus, the general rule remains that attorneys must look to their own clients for payment. *McLean*, 88 B.R. at 38.

Turning to the pending requests, it is not necessary to address each of the applicants' arguments in determining if substantial contribution fees are appropriate. After considering the totality of each appli-

cant's activities in the case, I reach the inescapable conclusion that no award is appropriate for neither applicant has acted in a way which truly fostered and enhanced the administration of these chapter 11 cases.

We begin with Cohn's request. A substantial amount of the services for which he seeks compensation occurred prepetition. Those included his referring Asher Rabinowitz to Milberg Weiss as well as his aiding in the formation of an ad hoc committee of limited partners. I am not prepared to hold, as the debtors seem to suggest is appropriate in their opposition papers, that as a bright line rule, services performed during prepetition negotiations and attempted workouts are not compensable under section 503(b) of the Bankruptcy Code. *Jensen–Farley*, 47 B.R. at 589. Indeed, ample case law suggests otherwise. Several courts have opined that expenses incurred prior to the filing of the bankruptcy petition are compensable under Code section 503(b)(3)(D) and (4) if they were intended to result, and ultimately do result in a substantial and demonstrable benefit to the estate. *See Lister*, 846 F.2d at 57; *accord In re Martin Exploration*, 1989 WL 152565, *3 (E.D.La.1989) (Even though the law sometimes allows prepetition attorneys' fees to be classified as administrative expenses, there has to be some determination by the court that those fees were of benefit to the debtor's estate); *In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 251 (Bankr.D.Colo.1990) (Applicant who seeks section 503(b) expenses for prepetition services must show an intent to benefit the debtor's estate, not simply that his activities resulted in some accidental, inadvertent or unintentional benefit); *In re Texaco, Inc.*, 90 B.R. 622, 630 (Bankr. S.D.N.Y.1988) (Expenses incurred prepetition are compensable under section 503(b) if they resulted in a substantial, demonstrable benefit to the estate), *citing Lister, supra; In re Valley Isle Broadcasting, Ltd.*, 56 B.R. 505, 506 (Bankr.D.Haw.1985) (The language of section 503(b) allows the court to permit as administrative expenses certain qualifying prepetition expenses which conferred upon the estate a substantial benefit).

Here, Cohn's prepetition activities in no way fostered the reorganization. It is of particular note that Cohn did not help to resolve the multidistrict litigation but actually opposed its resolution. Moreover, he was urging that the debtors' plan of reorganization not encompass the multidistrict litigation settlement but, instead, that the litigation be preserved. Neither his asserted help in forming the ad hoc committee, nor his participation in the multidistrict litigation demonstrates an intent to substantially benefit the debtors' estates, and any benefit that may have otherwise enured to the estates can be considered unintentional and incidental.

With respect to the changes Cohn alleges he was responsible for in the disclosure statement, the short answer is that Cohn did not object to the disclosure statement. Indeed, it was the LPOC that voiced its opposition to the debtors' disclosure statement, notwithstanding that Cohn may have planted the seed for certain objections with the LPOC.

Cohn also seeks recovery for fees and expenses which were incurred in the multidistrict litigation. Had Cohn some entitlement under applicable nonbankruptcy law to fees in that action, he might have asserted his request. But no such entitlement has been suggested. Nor has Cohn shown that he advanced the resolution of that litigation.

Cohn claims to have aided the LPOC in retaining an industry expert. However, that expert was of little use given the confidentiality stipulations that were already in place. More importantly, the industry expert's services were wholly unnecessary in that the Official Committee had already hired its own industry expert (retained with my approval after a contested hearing at which the challenge was mounted by the LPOC) to perform that very same function. *Lister*, 846 F.2d at 57 (duplicative services found neither useful nor beneficial and therefore not compensable under section 503(b)). Nor may Cohn be awarded compensation for work per-

formed by Calfee in asserting its own claims against these estates.

Cohn's transmission of information to various broker-dealers and limited partners did not confer a substantial benefit either, for there was an Official Committee whose mandate, among others, was to do just that. Whereas there was one potential lapse in the Committee's judgment regarding notice to limited partners, this was not endemic. No showing has been made that the Committee failed to fulfill this responsibility. The unrefuted record establishes that the Committee's chairman regularly communicated with the limited partners.

Nor can it be said that Cohn's ability to locate two potential purchasers for the debtors' business resulted in any demonstrable benefit to the estates, given that neither introduction led to an offer or plan alternative. *Lister*, 846 F.2d at 57–58. Simply put, none of Cohn's activities, either pre- or postpetition, resulted in any demonstrable and actual benefit to the Alert debtors.

■ The LPOC's substantial contribution request is equally unpersuasive. From the outset of its formation more than one year into these cases and only one month prior to the filing of Alert's plan and disclosure statement, the LPOC attempted to scuttle the reorganization towards which all major constituencies, including the representatives of the limited partners, had agreed to work. The LPOC objected at both the disclosure statement and confirmation hearings in an effort to derail confirmation. Its objections did not serve to enhance the distribution provided for the limited partners under the plan. Rather, the LPOC's actions (for only some of which its seeks compensation) generally served to increase significantly the administrative costs to these estates. On the flip side of the increased costs, one would expect to find a benefit conferred on the estates. But none appears here. The LPOC did not proffer a reorganization alternative acceptable to the constituencies necessary to confirm a plan.

The LPOC's objections to the disclosure statement did not alter the character of that document so substantially as to warrant compensation to the objector. Virtually all of the topics on which the LPOC successfully sought additional disclosure were described already in the disclosure statement, albeit to a lesser extent than requested by the LPOC. And a great many of the objections were overruled. Further, most of the objections were raised by other litigants such as Emergency Networks, L.P. Since I often direct parties to amend disclosure statements to add information sought by objectants so long as that information is accurate and not prejudicial, even without the benefit of the LPOC's objection, most of the changes to the disclosure statement would have been made anyway.

In that regard, this case is distinguishable from *Texaco*, cited by the LPOC in support of its application. 90 B.R. 622. There, a select group of attorneys who represented shareholder plaintiffs sought to have the company investigate the actions of its officers. The debtor subsequently filed for chapter 11 relief and put off commencing that investigation until after the disclosure statement and plan were filed. This investigation, when completed, was not documented in any fashion. Significantly, the equity committee never came out with a clear stance on the merits of the derivative actions and the plan did not include a settlement fund to be paid to the equity security holders. After reviewing the efforts of the attorneys, Judge Schwartzberg determined that the work performed by the derivative attorneys, which resulted in adequate disclosure to the shareholders of the plan's provisions and elucidation of the facts surrounding the director suits, was a substantial contribution to the case. 90 B.R. at 629.

Here, in contrast, the Official Committee was quite vociferous in its representation of the limited partners and, in the early stages of the chapter 11 cases, often found itself at loggerheads with the debtors. Because of this, I authorized the Official Committee to retain an investment banker and an industry expert. Moreover, the Official Committee took an active interest in the

prosecution and resolution of the multidistrict litigation. Indeed, the Official Committee obtained my authority to retain special counsel in that action to challenge a request for fees which the Committee opposed. Unlike in *Texaco,* the limited partners are the major beneficiaries of the reorganization, being the new owners of the rolled-up enterprise which merged the various arms of the Alert group of companies. In addition, the multidistrict litigation settlement provides that the settling class, including the limited partners, will share in a cash pool of approximately $47 million. Finally, and again unlike in *Texaco,* the additional information successfully requested by the LPOC had been sought by other parties in interest and most of it had been touched upon in the disclosure statement in any event. I cannot fail to note that in the one area where the LPOC's objections to the disclosure statement were particularly on target, that is, in the area of the description of the proposed settlement of the multidistrict litigation, the Official Committee, unsure of what it could permissibly say regarding that unapproved settlement, had taken it upon itself to prepare two versions of disclosure. One was laid out in broad strokes and the other, more detailed. The Official Committee urged me to permit the fuller disclosure. Thus, the cattle prod wielded by the LPOC was not actually necessary to goad the Official Committee and the debtors.

This was not a case where an entity was needed to take the reigns and foster cohesiveness out of a disparate class. Quite to the contrary, the limited partners voted overwhelmingly in favor of the debtors' plan. Nor was this a case where a group of individuals wanted to be heard in the reorganization and hired their own counsel out of fear that their voices would otherwise be silenced. There had already been appointed an official committee to represent the limited partners, and that committee hired attorneys, investment bankers, an industry expert and special counsel to aid it. In short, the LPOC did not add value to these estates but instead represented the views of a tiny minority of limited partners who disagreed with the reorganization strategy pursued by the Official Committee.

I had mentioned above that the LPOC brought to my attention the Official Committee's somewhat cavalier suggestion that I ought dispense with notice to the limited partners of a particular application. I denied the request to limit notice and instructed the Committee to remind the limited partners that they could file requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure. Unquestionably, the LPOC served as a watchdog in this one instance. But whether this conferred any demonstrable benefit on the limited partners, who were receiving regular communications from the Committee, is really impossible to say. Moreover, it is certain that the limited partners already had the right to receive expanded notice if they wished it. All that occurred as a result of the LPOC's actions, although they may have been well-intended, is that the limited partners were reminded of their ability to request notice.

■ In the end, neither Cohn nor the LPOC has demonstrated by a preponderance of evidence that the actions of either have caused any significant, substantial benefit to these debtors' estates. *FRG,* 124 B.R. at 658; *U.S. Lines,* 103 B.R. at 429. The phrase "substantial contribution" is not one taken lightly. Substantial means just that; important, essential, plentiful. *See Webster's Third New International Dictionary* (1981). Since neither has made the required showing and since the costs of administration have been increased by virtue of their actions, the requests for compensation are denied. SETTLE ORDER consistent with this decision.