### In re BEST PRODUCTS CO., INC., et al., Debtors.

### Bankruptcy No. 91 B 10048 (TLB).

United States Bankruptcy Court, S.D. New York.

Oct. 20, 1994.

As Corrected Oct. 24, 1994.

Weil, Gotshal & Manges by Harvey Miller and Kevin Barrett, New York City, for debtors.

Simpson Thatcher & Bartlett by Lillian Kraemer and Anthony DiGiacomo, New York City, for Bank Group.

Reid & Priest by Martin Bunin and Richard Solomon, New York City, for Casio, Inc.

Stroock & Stroock & Lavan by Lawrence Handelsman, New York City, for Creditors' Committee.

Debevoise & Plimpton by Michael Wiles and Peter Borowitz, New York City, for Dickstein Group.

Kaye, Scholer, Fierman, Hays & Handler by Arthur Steinberg, New York City, for Equitable Capital and Equitable Life.

Orans, Elsert & Lupert by Robert Plotz, New York City, Special Counsel for debtors.

Arthur J. Gonzalez by Joseph Gibney, U.S. Trustee, New York City.

### OPINION ON CONTESTED § 503(b) APPLICATIONS

TINA L. BROZMAN, Bankruptcy Judge.

Two creditors of Best Products Co., Inc. seek reimbursement for attorneys' fees which they incurred during the chapter 11 cases. The theory behind the requests by Casio, Inc. ("Casio") and the Dickstein Group is that they each made a substantial contribution to the cases, as a result of which their professionals are entitled to seek compensation pursuant to 11 U.S.C. § 503(b)(4). Best Products Co., Inc. and its affiliates (together, "Best") successfully reorganized, greatly reducing their debt and distributing all of their equity to creditors. Admitting that Casio, from the inception of the case, and the Dickstein Group, after it purchased a large block of unsecured debt from other creditors, were vocal players in the reorganization process, Best nonetheless challenges their claimed right to over $1 million in compensation for their professionals. Best contends that both Casio and the Dickstein Group were acting only in their own self-interest. This objection is echoed by the bank lenders and the United States Trustee.

I.

*Casio*

The chapter 11 cases were commenced on January 4, 1991. About ten days later, the United States Trustee appointed an eleven-member creditors' committee, one of whose seats was filled by Casio, which held a $10 million general unsecured claim. After the resignation of Black & Decker, Inc. from the committee, Casio became a co-chairperson. The committee chose as its counsel Stroock Stroock & Lavan. Not atypically, the members of the committee had different goals and some of them were potential targets of litiga-

tion by Best. In particular, certain lending institutions on the committee had received transfers in connection with a leveraged buyout ("LBO") of Best which transfer could be challenged as preferential or fraudulent. From its inception, the committee formed a trade subcommittee of each of the four trade creditors, including Casio. Black & Decker, Inc. was chairman of the subcommittee. Amendments to the bylaws purported to vest control of the prosecution of claims arising out of the LBO in the hands of the subcommittee, which wished to retain special counsel. Apparently, the subcommittee assumed that Best would never prosecute the claims which belonged to its estate.

In October 1991, another group of Best's trade creditors, self-styled as the "Unofficial Committee," filed a motion under § 1102 of the Code seeking the appointment of a separate committee of creditors to consist entirely of the debtor's trade creditors. This was not a revolt by the subcommittee of the official committee but, in reality, was an unseemly attempt by a law firm which did not represent the official committee to insinuate itself into the case, at the expense of Best's estate. The idea was that this hoped-for committee would investigate and pursue the LBO-related claims and guarantee that the interests of that constituency would be adequately represented in negotiations concerning a plan. The trade subcommittee did not share the aims of the Unofficial Committee and opposed its motion for a separate committee. The trade subcommittee was not alone in its opposition. The members of the official committee who were the likely targets of the proposed litigation filed a motion on December 3, 1991, seeking the appointment of an examiner under § 1104 of the Code for the purpose of conducting an independent examination of the viability of the LBO-related claims. In response, the trade subcommittee filed a motion seeking authority to employ special counsel to pursue the claims on behalf of the trade subcommittee.

The motions were heard together, the trade subcommittee vigorously opposing both the appointment of an examiner and the appointment of a separate trade creditors' committee and asking, instead, that I appoint special counsel for the trade subcommittee to pursue the LBO-related claims. Best joined the request for the appointment of an examiner to inquire into not only the existence of claims but the likelihood of recovery on them. I granted the motion for the appointment of an examiner and denied the other requests as premature.

Aided by lawyers and financial advisors, the examiner conducted a lengthy and expensive investigation, concluding that many of the legal issues were uncertain but that viable claims existed which ought be resolved by settlement or prosecution. Following the issuance of the report, Best's board of directors delegated to Stewart Kasen (Best's chief executive officer and the only director who was not on the board of directors at the time of the LBO) the authority to resolve or prosecute the LBO-related claims on behalf of the debtors. I approved Kasen's retention of special counsel to prosecute the claims notwithstanding the opposition of the trade subcommittee, which wanted to prosecute the claims itself or to have a successor examiner appointed to prosecute them. However, I also granted the trade subcommittee's application for the retention of Whitman, Heffernan & Rhein as financial advisors to the subcommittee to aid them in the negotiation of a plan. Note that the subcommittee did not make a request for separate legal counsel at that point. Apparently, the subcommittee's individual members, including Black & Decker, Inc. and Casio, continued to rely on their own legal counsel.

Best did institute litigation, a fraudulent transfer action arising out of the LBO, a preference action against Chemical Bank as agent for a syndicate of bank lenders, a preference action against a syndicate of lenders led by Equitable Deal Flow Fund, L.P. and a preference action against the Resolution Trust Corporation and McDonnell Douglas Corporation. All of these except the last have been settled as part and parcel of the plan process.

Casio now seeks reimbursement under § 503(b) for its expenses and efforts as the "de facto" representative of the trade creditors. Casio claims that its counsel undertook work that would have been otherwise per-

formed by counsel for the committee. In particular, Casio emphasizes its efforts in seeking out the best possible alternatives for resolution of the LBO-related claims.

*The Dickstein Group*

Debevoise & Plimpton represent the Dickstein Group, a "vulture" fund involved in the buying and selling of claims. In January 1993, some two years after the commencement of these cases, the Dickstein Group started purchasing general unsecured claims whose aggregate face amount exceeded $100 million as of the effective date of Best's plan. These claims acquired by the Dickstein Group were sufficiently large to give the Dickstein Group voting control over the class of claims which it acquired. After it had acquired a substantial position in the unsecured claims, presumably to increase its negotiating leverage, the Dickstein Group started to acquire bank claims as well, eventually purchasing some $44 million in such claims.

The Dickstein Group asserts that it contributed in two ways to the plan process: (i) it objected to provisions in earlier proposed plans regarding classification and treatment of the claims of the non-trade unsecured creditors and (ii) it encouraged the settlement of the LBO litigation. One of the devices which the Dickstein Group utilized was the threat that it would request leave to file a so-called "litigation trust" plan, pursuant to which Best would emerge from reorganization with the LBO litigation unresolved. Neither the debtors nor the defendants in the LBO litigation (who were Best's largest creditors and therefore would become its largest shareholders) wanted to leave the litigation unresolved. Interestingly, Casio and the Dickstein Group were actually at odds with one another, for Casio pressed for a return different from that contemplated for the non-trade unsecured creditors such as the Dickstein Group, treatment which the Dickstein Group fought; it is ironic that both contenders seek payment from the estate for their efforts.

## II.

Section 503(b) of the Bankruptcy Code provides that a creditor who has made a substantial contribution to a chapter 11 case shall receive an administrative expense claim equal to its reasonable fees and necessary expenses, and, if applicable, its counsel's reasonable fees and expenses. 11 U.S.C. § 503(b)(3)(D) and (b)(4); *In re U.S. Lines, Inc.,* 103 B.R. 427, 429 (Bankr.S.D.N.Y.1989), *aff'd,* 1991 WL 67464 (S.D.N.Y.1991). Although the term "substantial contribution" is not defined in the Code, courts have found that an applicant satisfies the substantial contribution test when it has provided "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." *U.S. Lines,* 103 B.R. at 429, (citing *In re McLean Industries, Inc.,* 88 B.R. 36, 38 (Bankr.S.D.N.Y.1988)); *In re Rockwood Computer Corp.,* 61 B.R. 961, 965 (Bankr.S.D.Ohio 1986).

 The substantial contribution test is intended to promote meaningful creditor participation in the reorganization process, but not to encourage mushrooming administrative expenses. *See In re Baldwin–United Corp.,* 79 B.R. 321, 338 (Bankr.S.D.Ohio 1987). Each § 503(b) applicant must prove by a preponderance of the evidence that the services it rendered for which it seeks compensation provided a substantial benefit to the estate. *U.S. Lines,* 103 B.R. at 429, citing *In re Hanson Industries, Inc.,* 90 B.R. 405, 409 (Bankr.D.Minn.1988); *In re Jack Winter Apparel, Inc.,* 119 B.R. 629, 633 (E.D.Wis.1990); *see In re D.W.G.K. Restaurants, Inc.,* 84 B.R. 684, 689 (Bankr.S.D.Cal. 1988). Compensable services are those which facilitate progress of the case, *In re K–Fab, Inc.,* 118 B.R. 240, 242 (Bankr.M.D.Pa. 1990), rather than those which retard or interrupt. *In re Richton International Corp.,* 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981). Factors which the courts have considered in determining whether an applicant has made a substantial contribution in a chapter 11 case include: whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others. *In re FRG, Inc.,* 124 B.R. 653, 658 (Bankr.E.D.Pa.

1991); *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 194 (Bankr.S.D.Tex.1989).

Benefits which have been found to be insubstantial include those services which would merely deplete the assets of the estate without providing a corresponding greater benefit. *U.S. Lines*, 103 B.R. at 429. "Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests." *U.S. Lines*, 103 B.R. at 430 (citing *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 571 (Bankr.D.Utah 1985)); *accord In re Sound Radio, Inc.*, 145 B.R. 193, 208 (Bankr.D.N.J.1992). Whereas services that confer a significant and demonstrable benefit upon the reorganization process which have not been rendered solely on behalf of a creditor's own interest should be compensated, *GATX Terminals Corp. v. Tarricone (In re Tarricone, Inc.)*, 83 B.R. 253, 255 (Bankr.S.D.N.Y.1988), extensive participation in a case, without more, is insufficient to compel compensation. *McLean*, 88 B.R. at 38. And efforts undertaken by creditors solely to further their own self-interest are not compensable under section 503(b). *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988). The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate. Compensation must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate. *Richton*, 15 B.R. 854. Thus, the general rule remains that attorneys must look to their own clients for payment. *McLean*, 88 B.R. at 38.

Whereas the facts are undisputed here, the perspectives from which the parties view them differ greatly. Depending on how one chooses to tilt the prism, the actions of Casio and the Dickstein Group were either (1) the product of saintliness on their part or (2) a devilish skirmish between them, the effect of which was to fasten a stone round Best's neck as it tried to swim toward the safe haven of reorganization. The truth, like most things in law and life, lies between these extremes. Hyperbole is unnecessary. The successful reorganization of Best is a textbook case of how the creative, often contentious, process of bankruptcy negotiations can bear abundant fruit. The narrower question is whether or not the individual creditors active in these negotiations are deserving of § 503(b) awards.

There is no question but that Casio and the Dickstein Group worked hard and ably to protect their respective positions. And to the extent that they each ultimately agreed to a plan, their actions produced a degree of incidental benefit to all of the creditors. (Unfortunately, however, the plan was still contested, requiring an eight-day confirmation hearing.) Nonetheless, I cannot find that either applicant rendered a substantial contribution warranting compensation from the estate. Their efforts were no different from the efforts of other creditor constituencies, such as the banks and the subordinated lenders, to maximize their participation in the debtors' distributions.

The applicants point excitedly to *Richton*, cited above, as support for their claimed entitlement to compensation. In that case, Weil, Gotshal & Manges ("Weil") represented the banks, which had extensive financial interests in the debtors. Judge Galgay noted that after filing the chapter 11 petitions, "Weil aided the securing of intercompany cash advances among the Debtors, facilitated the operation of the Banks as an organized creditors group before the Creditors' Committee was appointed, and generally oversaw the relatively smooth, cooperative, and productive progress of these cases … Throughout these proceedings Weil has represented the Banks. Nonetheless, Weil's involvement in these cases, its expertise, and the services it has rendered have made a substantial contribution to the reorganization of the Debtors." *Id.* at 855. In awarding the fees, Judge Galgay made two important points distinguishing *Richton* from this case. The first is that Weil excluded from its § 503(b) application those services which served only its client's interest. *Id.* at 856. Second, Judge Galgay noted "not only the absence of objection to Weil's application but rather a warm recommendation by the Debtors and the Creditors' Committee that it be allowed." In contrast, here the applicants were acting

to further their own self-interest and have not excluded those services. Moreover, there has been substantial opposition to the requested compensation.

■ The record does not demonstrate that Casio acted beyond its own aims in protecting its $10 million claim as an unsecured creditor. It is noteworthy that Casio had engaged counsel before it acceded to Black & Decker's position on the committee and notwithstanding that Black & Decker had its own counsel. This certainly suggests that Casio's motivation was to protect itself. Further, Casio's insistence on treatment different from that of the non-trade creditors actually prolonged the negotiating process and caused the Dickstein Group to fire up its guns. This is not a case where a significant creditor has agreed to take a lesser distribution in order to achieve a consensual plan. Much of Casio's counsel's services consisted of general participation in the case. In addition, the activities of Casio and the trade subcommittee in attempting to obtain control over the claims belonging to the debtors when the debtors steadfastly evidenced an intention to pursue them, consistent with their fiduciary duties, did not substantially contribute to the chapter 11 cases. Finally, Casio apparently did not feel that the trade creditors were at a disadvantage, for it opposed the motion for the appointment of a separate committee and when it applied to this court for permission for the trade subcommittee to retain financial advisors (which request was granted), it did not seek counsel for the group. Rather, Casio waited until the conclusion of the case to announce that the trade subcommittee was in need of protection, which protection it had provided. Had Casio requested the appointment of counsel for the trade subcommittee, then the court would have had some control over the magnitude and scope of the services to be rendered should the motion have been granted. Instead, Casio seeks to foist the cost of its own counsel on the estate without having allowed the parties in interest any opportunity to address in advance the role that such counsel should fulfill. For all these reasons, compensation under section 503(b) is not warranted.[1]

■ The Dickstein Group's application is even less persuasive. The Dickstein Group was a relative newcomer to the scene which purchased claims to make a profit. Unlike other creditors, it was not attempting to salvage as much as possible from a credit decision gone awry. I do not mean to suggest that the Dickstein Group was villainous; indeed, there is something to be said for the liquidity with which investors such as the Dickstein Group provide creditors. The point is that in cases such as this, the investor is looking out for itself, not for the estate as a whole. This is further demonstrated here by the Dickstein Group's acquisition of bank debt when it perceived some difficulty in persuading that class of the merits of its views as an unsecured creditor. With respect to the contention that the Dickstein Group single-handedly managed to eliminate the alleged unfair discrimination as to the non-trade unsecured creditors, the facts are that the settlement of the preference action against the Equitable Deal Flow Fund, L.P. coupled with the reduction in unsecured claims permitted the promulgation of a plan which eliminated the provision which the Dickstein Group found offensive. In any event, as noted earlier, both sides to this dispute are seeking compensation, demonstrating rather plainly that their interests were parochial. Finally, the Dickstein Group's threat of a litigation trust plan was not beneficial, for as I observed when I confirmed the plan,

"it was certainly preferable for Best and its creditors to attempt to resolve the litigation prior to emergence from chapter 11. The use of a litigation trust plan involved significant costs (one of which was that the Banks would never agree to such a plan, making confirmation very difficult, and another of which was the high cost [as much as $15 million] of the litigation itself) and raised its own legal issues, including the

---

1. Some of the services provided by Casio's counsel smack of possible duplication as well. Counsel's attendance at creditors' committee meetings, attendance at hearings, and review and analysis of LBO-related claims were all activities that counsel to the creditors' committee undertook. To some extent services such as these were duplicative.

peculiar situation of Best suing its major stockholders. There were also practical reasons not to continue the litigation, such as the serious distraction of senior management of the reorganized enterprise."'

*In re Best Products Co., Inc.*, 168 B.R. 35, 63 (Bankr.S.D.N.Y.1994). Not only was the work to prepare such a plan of dubious benefit, but the Dickstein Group never pursued it. Accordingly, for much the same reasons that I conclude that Casio's counsel is not entitled to compensation from the estate, I decline to grant compensation to the Dickstein Group's counsel. The attorneys involved must look to their clients for payment.

SETTLE ORDER consistent with this decision.