**In re RANDALL'S ISLAND FAMILY GOLF CENTERS, INC., et al., Debtors.**

**Short Pump Entertainment, L.L.C., Plaintiff,**

**v.**

**Randall's Island Family Golf Centers, Inc. and JPMorgan Chase Bank, Defendants.**

Bankruptcy Nos. 00–41065(SMB) to 00–41101(SMB), 00–41103(SMB) to 00–41196(SMB).
Adversary No. 01–2440(SMB).

United States Bankruptcy Court, S.D. New York.

Nov. 7, 2003.

Wachtel & Masyr, LLP, Steven J. Cohen, Of Counsel, New York City, for Plaintiff.

Golenbock, Eiseman, Assor, Bell & Peskoe, Jonathan L. Flaxer, Jacqueline G. Veit, Adam C. Silverstein, Of Counsel, New York City, for Randall's Family Golf Centers, Inc.

Morgan, Lewis & Bockius, LLP, Neil E. Herman, William C. Heuer, Of Counsel, New York City, for Chase Manhattan Bank p/k/a JPMorgan Chase Bank.

## POST–TRIAL DECISION

STUART M. BERNSTEIN, Chief Judge.

The defendant and debtor, SkateNation of Richmond West, LLC, previously owned and operated an ice skating facility in a shopping center located in Glen Allen, Virginia. The owner of the shopping center and the plaintiff in this litigation, Short Pump Entertainment, LLC ("Short Pump"), commenced this litigation to determine the extent and validity of its lien for unpaid common area maintenance, or CAM, charges. The Court conducted a two day trial, and now concludes that Short Pump's claim is unsecured, and not entitled to a priority. Since the unsecured creditors will not receive any distribution under the debtors' confirmed plan, judgment will be entered dismissing the amended complaint, and Short Pump's amended complaint will be treated as a duly filed proof of its unsecured claim.

## BACKGROUND

### A. The Parties' Interests

At all relevant times, Short Pump, or its predecessor Short Pump Investors LP (collectively "Short Pump") owned and developed a shopping center, known as "Downtown Short Pump," in Henrico County, Virginia. (Trial Transcript of

June 18, 2003 ("Tr.I")[1] at 29, 32–35; Plaintiff's Exhibit ("PX") 2.) The development commenced in 1995. As part of the development, Short Pump caused a certain Declaration of Easements and Covenants (the "Declaration") to be recorded in the Office of the Clerk of the Circuit Court of Henrico County, Virginia, on or about June 26, 1995 (Tr. I at 43; PX 3.) J. Thomas O'Brien, Esq., Short Pump's in-house counsel, drafted the Declaration. (Tr. I at 42, 69.)

The Declaration, which was governed by Virginia law, required Short Pump to "maintain or cause to be maintained the Common Area and Common Area Improvements ... at all times in first class order and condition in a good and clean condition as is characteristic of, or equivalent to, first class community shopping centers in the Richmond, Virginia area." (Declaration § 8.2; PX 3, p. S00216–217.) Sections 8.3 and 2.21, read together, obligated the parcel owners to pay their proportionate share of the CAM costs. Lastly, § 8.4 authorized Short Pump to add a 10% administration fee to the charges.

If a parcel owner failed to pay its proportionate share of CAM charges, § 14.5 of the Declaration granted Short Pump a lien on the parcel in question:

> Any costs required to be reimbursed to the Declarant pursuant to the provisions of this Declaration, including, but not limited to, an Owner's Proportionate Share of the Actual Costs of Common Area Maintenance ... together with interest as provided herein, shall constitute a lien upon the Parcel and improvements and fixtures thereon owned by such Owner until paid. Such lien shall have priority over all other liens, including without limitation mortgages, deeds of trust or any other lien hereafter placed upon any Parcel, *except a first mortgage or deed of trust securing an outstanding loan by a bona fide unaffiliated lender, to which such lien shall be subordinate.* The amount of any such lien may be enforced by suit or otherwise, at the election of the Declarant, and the Owner shall reimburse the Declarant for all attorney's fees and expenses incurred in so doing, the amount of which shall also constitute a lien on such Owner's Parcel and improvements and fixtures thereon as herein provided.

(PX 3, p. SP 00222 (emphasis added).)

On December 13, 1995, Short Pump conveyed a parcel of land within the shopping center (the "Parcel") to the debtor, then known as Richmond Ice Forum West, LLC ("Richmond Ice"). (*See Stipulation and Order for Documents to be Admitted at Trial*, dated June 18, 2003 ("*Stipulated Order*"), Ex. B)(Credit Line Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, at p. JPM 0047.) The Bargain and Sale Deed (the "Deed") expressly stated that the conveyance was subject to the Declaration. (PX 2A.)

On December 2, 1999, Chase filed, on behalf of itself and as agent for several other lenders,[2] a Credit Line Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Credit Line Deed of Trust") with the Henrico County, Virginia, County Clerk's Office. (*Stipulated Order*, Ex. B.) The Credit Line Deed of Trust was amended and restated on October 15, 1999, registered as instrument no. 057299, and recorded at Book 2966, pages 1950–1966. Pursuant to the

---

1. "Tr. I" refers to the transcript of the June 18, 2003, proceedings. "Tr. II" refers to the June 19, 2003 transcript.

2. "Chase" includes the other lenders as well as Chase.

Credit Line Deed of Trust, the debtor became liable to Chase in the approximate sum of $130,000,000.00 in respect of loans made and letters of credit issued by or on behalf of the debtor. As security, Chase obtained a lien, *inter alia,* on the Parcel (the "Chase Lien"). (*Stipulated Order,* Ex. B.)

## B. The Disputed Construction

On November 12, 1999, Short Pump entered into a construction contract with Canavan Construction Company ("Canavan"). Canavan became the general contractor in charge of certain work required to, among other things, correct problems with drainage facilities at the shopping center site. The initial budget for all of the site work was $3,000,711.00 (PX 6, p. SP 00424), but it increased by approximately 10% as a result of change orders to the Canavan Contract. (*See* PX 11, p. SP 00474–532.)

The principal area of the parties' dispute, and the focus of the two day trial, concerned the allocation of the cost of the work done by Canavan. In this adversary proceeding, Short Pump contends that the total CAM charges allocable to the parcel owners was $608,029.44, (Tr. I at 151), including the 10 percent administrative fee. (Tr. II at 31.) Short Pump initially calculated the debtor's proportionate share at 29.08%, and its total obligation for CAM charges at $176,841.24. (PX 20.) Pursuant to a revised invoice, dated March 8, 2002, Short Pump recalculated the debtor's proportionate share of the CAM charges at 58.75%. (Debtor–Defendant's Exhibit "I," p. SP 00012.) The increased share was based, according to Short Pump, on its reassessment of the "Gross Developed Area" under the Declaration.[3] (Tr. I at 173.)

---

**3.** Short Pump did not increase the proportionate share of any of the other existing

## C. The Bankruptcy Proceedings

During the chapter 11 case, the affiliated debtors sold their real property or leaseholds, including the Parcel, at auction. The Parcel and related personalty brought in approximately $3.3 million (net of closing adjustments), and $3.05 million was attributed to the sale of the real property. (*See Stipulated Order,* Ex. B)(*Order Approving the Motion (I) Determining the Extent, Validity and Priority of the Claims and Liens of the Chase Manhattan Bank, As Agent and (ii) Authorizing Payment to Chase of Net Proceeds of Sales (Real Property),* dated July 31, 2001, at p. 5)(the "July Order".)

After these transactions had closed and pre-existing liens and cure amounts had been satisfied or escrowed, Chase made a motion to determine the extent, validity and priority of its lien claims, and to authorize payment of the proceeds. (*See Stipulated Order,* Ex. B)(*Motion for an Order (I) Determining the Extent, Validity and Priority of Claims and Liens for the Chase Manhattan Bank, as Agent and (II) Authorizing Payment to Chase of Net Proceeds of Sales,* dated June 20, 2001)(the "Chase Motion".) According to the Chase Motion, the debtors owed approximately $144 million in connection with Chase's pre-petition, secured loan. (*Id.* ¶ 11.)

Short Pump objected to the Chase Motion. Part of the objection pertained to the procedure employed by Chase. Short Pump also sought to ensure that enough money was held back to satisfy its lien in the event that the Short Pump lien was superior to the Chase Lien. The dispute between Chase and Short Pump was resolved through negotiations to which the

parcel owners. (Tr. I at 175.)

Court was not privy. In the end, Chase presented and the Court signed an order authorizing and directing the debtors to turn over $18,048,080.47 in sales proceeds to Chase.[4] (July Order ¶ 4.) The sum of $255,000.00 was "held back with respect to a dispute with Short Pump." (*Id.*, p. 5 n. 11.)

After the sale, Short Pump commenced this adversary proceeding. Through its amended complaint, it seeks a judgment in the sum of $357,217.30 for CAM charges, $313,123.10 for attorneys' fees and $28,912.97 in interest (as of August 14, 2003), for a total of $699,253.37. In addition, Short Pump contends that its claim is fully secured, and is also entitled to an administrative priority.

The debtor and Chase argue, in the main, that most if not all of the Canavan work involved new construction rather than common area maintenance. The parties agree that Short Pump was solely responsible for new construction, but the parcel owners had to reimburse Short Pump for CAM charges. The defendants have raised several other issues relating to the method of allocating and assessing the costs, but their bottom line is that Short Pump failed to prove that the debtor owes anything. Chase also disputes Short Pump's lien, maintains that any Short Pump lien is capped at the $255,000.00 reserved under the July Order,[5] and moreover, is subordinated to the Chase Lien. In

addition, the defendants contend that Short Pump failed to prove its entitlement to an administrative claim.

## DISCUSSION

### A. The Lien Claim

#### 1. Notice of Short Pump's Lien

■ Short Pump's lien claim arises under § 14.5 of the Declaration, quoted *supra*. Chase initially argues that the Declaration was not properly recorded, and did not give Chase actual or constructive notice of Short Pump's lien. The creation, attachment and perfection of security interests in real property are matters governed by state law. *Oregon v. Corvallis Sand and Gravel Co.*, 429 U.S. 363, 378–79, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). Here, the Parcel is located in the State of Virginia, and hence, the law of Virginia governs.

■ Under Virginia law, a written contract demonstrating an intent to secure a debt with a lien on a particular property creates an equitable lien enforceable against the property. *In re James R. Corbitt Co.*, 20 B.R. 460, 461 (Bankr. E.D.Va.1982); *Hoffman v. First Nat'l Bank*, 205 Va. 232, 135 S.E.2d 818, 821–22 (1964). The equitable lien arises when the instrument creating the equitable lien is recorded. *In re James R. Corbitt Co.*, 20 B.R. at 462. If the instrument creates a

---

4. After payment, the debtors still owed Chase over $126 million, and the debt continued to grow as interest accrued and legal fees and expenses were incurred by Chase.

5. In a post-trial letter brief requested by the Court, Short Pump argued that the July Order constituted a concession by Chase that "its first priority lien did not take precedence over Short Pump's claim for at least $255,000.00," and moreover, the concession estopped Chase from arguing the contrary. (Letter dated Oct. 7, 2003, from Steven J. Cohen, Esq. to the

Court ("Cohen Letter"), at 2.) Short Pump's interpretation of the July Order is, however, of recent vintage, and contradicts the Joint Pre-Trial Order, dated Apr. 10, 2003 ("JPTO"). There, the parties agreed that one of the issues was "[w]hether any security interest or lien claimed by Plaintiff is junior to the security interest and lien claimed by JPMorgan Chase Bank." (JPTO, p. 7.) No mention was made of the July Order or its purported recognition of Short Pump's superior lien in at least the $255,000.00.

lien for future, unpaid assessments, the equitable lien becomes effective upon assessment and relates back to the filing date, binding subsequent purchasers who took with notice of the inchoate lien. *See Noremac, Inc. v. Centre Hill Court,* 164 Va. 151, 178 S.E. 877, 880–881 (1935). The purchaser, in this regard, has a duty to inquire into the information reasonably disclosed by matters of record, *Allen v. Green,* 229 Va. 588, 331 S.E.2d 472, 476 (1985), and will be charged with notice of all that the title papers would have disclosed upon a complete examination. *Shaheen v. County of Mathews,* 265 Va. 462, 579 S.E.2d 162, 171 (2003); *Chavis v. Gibbs,* 198 Va. 379, 94 S.E.2d 195, 197 (1956).

■ Here, Short Pump recorded the Declaration in Henrico County where the Parcel is situated. Section 14.5 plainly grants a lien to Short Pump for future unpaid CAM charges. Furthermore, the covenant granting the lien runs with the land. Section 3.1 provides that the parcels shall be conveyed "subject to this Declaration and all of the easements, covenants, conditions, and restrictions set forth herein" which shall bind future owners. (PX 3, p. S00209.) In addition, § 27, entitled *Covenants Running With the Land,* states that

> Each and every agreement, covenant, promise, undertaking, condition, easement, right, privilege, and restriction … made … by the Declarant or by any Owner, is made for the benefit of the Declarant and all Owners, their successors and assigns, and all other persons acquiring an interest in the [property] … All of the provisions of this Declaration shall be covenants running

with the land pursuant to applicable law. Any Owner of a Parcel shall automatically be deemed by acceptance of the title of such Parcel or any part thereof to have assumed all obligations of this Declaration relating thereto, and to have agreed with the then Owner or Owners of all Parcels to execute any and all instruments and do any and all things reasonably required to carry out the intention of this Declaration.

(PX 3, p. S00225.)

The Deed, in turn, states that the Parcel was being conveyed by Short Pump to Richmond Ice "subject to that certain Declaration of Easements and Covenants dated as of June 26, 1995, which is recorded in the Clerk's Office of the Circuit Court of Henrico County, Virginia, in Deed Book 2590, page 737…." (PX 2A.) The Deed forms part of the Parcel's chain of title. A subsequent lienor such as Chase had notice of the Deed, the Declaration and Short Pump's lien for unpaid CAM charges.[6] Furthermore, although the debt for unpaid CAM charges had not yet been assessed when Chase acquired its lien, the Short Pump lien based on later assessments relates back to the recordation date, and primes the Chase Lien unless the Declaration itself limits Short Pump's rights.

**2. The Subordination of Short Pump's Lien**

■ This conclusion brings us to the more crucial question of whether the Declaration grants the Chase Lien a priority over Short Pump's lien. Section 14.5 subordinates the lien for unpaid CAM charges to "a first mortgage or deed of trust securing an *outstanding loan* by a bona fide unaffiliated lender." (Emphasis added.)

---

6. In addition, Schedule B of the Credit Line Deed of Trust identifies the "Permitted Encumbrances" that retain priority over the Chase Lien. These include "[c]ovenants, con-

ditions and restrictions of record as of the date of this Deed." (*Stipulated Order,* Ex. B)(Credit Line Deed of Trust, p. JPM 0040, ¶ 7.)

The Court has already determined that Chase holds a "first mortgage or deed of trust," (*see* July Order ¶ 3)("Chase has a valid and duly perfected first priority lien"), and Short Pump does not quarrel with Chase's status as an "bona fide unaffiliated lender." ("Cohen Letter" at 3.) In addition, Chase is clearly undersecured.[7] As a result, if the Chase Lien primes the Short Pump lien, Short Pump will be completely unsecured.

The dispute regarding the meaning of the subordination provision centers on the phrase "outstanding loan." Short Pump argues that the subordination only applies to a loan that was outstanding as of the date of the Declaration. Chase contends, however, that § 14.5 is not limited by the timing of the loan, and the subordination elevates the first lien securing a present or future debt provided that it is held by a "bona fide unaffiliated lender."

Both sides have offered reasonable interpretations. On the one hand, Short Pump asks, rhetorically, why it would grant such a gift to future lenders. Moreover, a parcel owner could run up unpaid CAM charges, borrow money and give a priming lien to its lender, and not even use the proceeds to satisfy the CAM charge debt.

On the other hand, the subordination provision can be read as Chase argues it should be. First, § 14.5 appears to subordinate the CAM charge lien to certain mortgages and liens "hereinafter placed upon any Parcel." Hence, the subordination provision looks to future liens. Second, the Declaration was filed in June 1995, at the beginning of the development

stage. At the time, Short Pump still apparently owned all of the parcels. The only liens on the property were those Short Pump inherited or placed on the property itself. If the subordination provision was limited to these existing debts, it would have been simple enough for Short Pump to list the "outstanding loans" as a schedule to the Declaration. Third, the subordination provision encourages future sales and development of the parcels—a benefit to Short Pump—by allowing the purchaser or parcel owner to obtain financing.

 Under Virginia law, whether a document is ambiguous presents a question of law. *Musselman v. Glass Works, LLC,* 260 Va. 342, 533 S.E.2d 919, 921 (2000); *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.,* 258 Va. 524, 521 S.E.2d 761, 763 (1999). "An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time." *Renner Plumbing, Heating and Air Conditioning, Inc. v. Renner,* 225 Va. 508, 303 S.E.2d 894, 898 (1983). If the contract is clear and unambiguous, the court's duty is to enforce it according to its plain meaning. *Winn v. Aleda Constr. Co., Inc.,* 227 Va. 304, 315 S.E.2d 193, 194 (1984). If, however, an ambiguity exists, the contract will be construed more strictly against the party that drafted it. *Martin & Martin, Inc. v. Bradley Enters., Inc.,* 256 Va. 288, 504 S.E.2d 849, 851 (1998); *Mahoney v. NationsBank of Virginia, N.A.,* 249 Va. 216, 455 S.E.2d 5, 9 (1995); *Winn v. Aleda Construction Co., Inc.,* 315 S.E.2d at 195.

---

**7.** After the sales proceeds were turned over to Chase in 2001, the debtors still owed Chase over $126 million, and that debt increased during the next two years. The debtors estimated that on the effective date of their Plan (which was July 10, 2003), the combined es-

tates would have only $4,100,000.00. (*See* Second Amended Disclosure Statement for the Third Amended Joint Plan of Liquidation, dated Apr. 29, 2003, at 17)(ECF Docket # 1739.)

As noted, both parties offered reasonable interpretations of § 14.5, and I conclude that the subordination provision is ambiguous. Neither party offered parol evidence at trial concerning the meaning or purpose of the subordination provision. The only pertinent evidence involved Short Pump's authorship of the Declaration. Since Short Pump drafted the Declaration and no evidence shed light on its meaning, the Court will invoke the doctrine of *contra proferentem,* and adopt Chase's interpretation. The subordination provision applies, therefore, to present *and future* "outstanding loans." Consequently, Short Pump's CAM charge lien is subordinated to Chase's Lien, leaving Short Pump with an unsecured claim.

## B. The Priority Claim

 Short Pump also asserts that its claim for unpaid CAM charges and related attorneys' fees and expenses is entitled to an administrative expense priority on a "substantial contribution" basis under 11 U.S.C. § 503(b). Section 503 provides, in pertinent part, as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
. . . .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
. . . .

(D) a creditor, an indenture trustee, an equity security holder, or committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title.
. . . .

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

The substantial contribution provisions are narrowly construed, *In re United States Lines, Inc.,* 103 B.R. 427, 429 (Bankr. S.D.N.Y.1989); *In re Baldwin–United Corp.,* 79 B.R. 321, 336 (Bankr.S.D.Ohio 1987), and limited to "those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate." *In re Best Prods. Co.,* 173 B.R. 862, 866 (Bankr.S.D.N.Y.1994), *accord In re United Merchants and Mfrs., Inc.,* No. 97 CIV.5437(DC), 1999 WL 4929, at *2 (S.D.N.Y. Jan.5, 1999). Compensation is limited to those extraordinary actions, *In re Best Prods. Co.,* 173 B.R. at 866; *In re Alert Holdings, Inc.,* 157 B.R. 753, 757 (Bankr.S.D.N.Y.1993), that lead to an "actual and demonstrable benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders." *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 569 (Bankr.D.Utah 1985); *accord In re Lister,* 846 F.2d 55, 57 (10th Cir.1988); *In re Best Products Co.,* 173 B.R. at 865; *In re Alert Holdings, Inc.,* 157 B.R. at 757; *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Texaco, Inc.,* 90 B.R. 622, 630 (Bankr.S.D.N.Y.1988); *In re McLean Indus., Inc.,* 88 B.R. 36, 39 (Bankr.S.D.N.Y. 1988). The applicant bears the burden of proving, by a preponderance of the evidence, that he has rendered a substantial contribution. *In re Lister,* 846 F.2d at 57; *In re Best Products Co.,* 173 B.R. at 865; *In re Alert Holdings, Inc.,* 157 B.R. at 757; *In re United States Lines, Inc.,* 103 B.R.

at 429; *In re Baldwin–United Corp.,* 79 B.R. at 336.

■ Short Pump's substantial contribution claim suffers from two fatal shortcomings. First, Short Pump failed at trial to identify or distinguish between its prepetition and post-petition CAM services and related charges. The applicant must show a "substantial contribution *in a case* under chapter … 11." 11 U.S.C. § 503(b)(3)(D)(emphasis added). The debtor's case began when it filed its voluntary petition on May 4, 2000, *see* 11 U.S.C. § 301, and the "substantial contribution" claim is limited by the terms of the Code to activities after that date. *See In re Balport Constr. Co., Inc.,* 123 B.R. 174, 180–81 (Bankr.S.D.N.Y.1991); *In re Lockwood Enters., Inc.,* 54 B.R. 829, 831 (Bankr.S.D.N.Y.1985).

During cross-examination, Robert Jacoby, the individual responsible for managing the development of Downtown Short Pump, was shown the September 30, 2000 bill sent to the debtor, and asked to identify the costs attributable to pre-petition work. He responded: "I would have to go through and do an analysis. I can't answer that question easily." (Tr. II at 171.) In the absence of evidence identifying those costs, Short Pump has failed to prove its entitlement to an administrative expense under § 503(b)(3).

Second, Short Pump failed to show that the services underlying the CAM charges conferred a "demonstrable" benefit on the debtor's estate. As noted, the debtor sold the Parcel for approximately $3.3 million, and allocated $3.05 million to the real property. Nothing in the record, such as valuation evidence, indicates that the Parcel would have sold for less, or by how much less, if Short Pump had not provided those services. Moreover, there was nothing extraordinary about the CAM services; Short Pump was contractually obligated to render them under the Declaration. In sum, Short Pump failed to show that it was entitled to a "substantial contribution" award.

In light of the foregoing disposition, no purpose would be served by going through the time-consuming exercise of placing a value on Short Pump's unsecured CAM claim. As stated at the outset, the debtors confirmed a plan that did not provide for any distribution to unsecured creditors. Consequently, the size of Short Pump's claim is immaterial, and it may be treated as the holder of an unsecured claim in the sum sought in the amended complaint.

## CONCLUSION

The parties are directed to settle a judgment dismissing the amended complaint and treating the same as a proof of Short Pump's unsecured claim. The foregoing shall constitute the Court's findings of fact and conclusions of law.